IN THE CHANCERY COURT OF TENNESSEE
FOR THE THIRTIETH JUDICIAL DISTRICT AT MEMPHIS

MCFADDEN COMMUNICATIONS, LLC,

     Plaintiff,

v.

     No. CH-09-0864-2

THE TRAVELERS INDEMNITY
COMPANY OF AMERICA,

     Defendant.

---

## COMPLAINT FOR DAMAGES

---

TO THE CHANCELLORS OF THE CHANCERY COURT FOR THE THIRTIETH JUDICIAL DISTRICT:

     Comes now the plaintiff, McFadden Communications, LLC, by counsel, and for its complaint against the defendant, The Travelers Indemnity Company of America, states as follows:

     1.  McFadden Communications, LLC ("McFadden") is a limited liability company organized and existing under the laws of the State of Tennessee with its principal place of business in Memphis, Shelby County, Tennessee.

     2.  The Travelers Indemnity Company of America ("Travelers") is a foreign insurer authorized to do business in the State of Tennessee.  Its registered agent for service of process is Leslie Newman, Commissioner of the Tennessee Department of Commerce and Insurance, 500 James Robertson Parkway, Fifth Floor, Nashville, Tennessee 37243.

     3.  Personal jurisdiction over Travelers is proper pursuant to T.C.A. § 20-2-201 *et seq.* and § 56-2-501 *et seq.*  Venue in this Court is proper pursuant to T.C.A. § 20-4-101 *et seq.*

Exhibit 1

**The Travelers/McFadden Insurance Policy**

4.  At all relevant times, Travelers insured McFadden's property at 1836 Chelsea, Memphis, Tennessee, pursuant to insurance policy No. 680 3085L148 issued by Travelers to McFadden (the "Travelers/McFadden Policy"). The Chelsea property is listed in the Travelers/McFadden Policy as premises location no. 02, building no. 01.

5.  The Travelers/McFadden Policy includes Businessowners Property Coverage. A true and complete copy of the relevant Businessowners Property Coverage Special Form, No. MP T1 02 02 05, is attached as Exhibit 1. McFadden's building at 1836 Chelsea is "Covered Property" as defined therein. *See* Exhibit 1, p. 1, Section A. 1.

**McFadden's Insurance Claim and Travelers' Wrongful Denial**

6.  On or about September 12, 2008, McFadden suffered vandalism damage and theft losses at 1836 Chelsea. Thieves broke into the building and stole valuable copper and electrical material, equipment, and fixtures.

7.  The theft claim was timely reported to Travelers by McFadden.

8.  McFadden complied with all duties imposed upon it in the event of loss or damage as prescribed by the Travelers/McFadden Policy in a complete and timely manner. *See* Exhibit 1, p. 27-28, Section E. 3.

9.  Travelers did not fully and adequately investigate McFadden's claim as it is obligated to do.

10.  Travelers wrongfully denied McFadden's claim under the Travelers/McFadden Policy. By letter dated December 4, 2008, Michael Brown, Technical Specialist with Travelers,

2

Exhibit 1

denied the claim ostensibly because the building at 1836 Chelsea had been vacant for more than 60 days prior to the date of loss.  A true and complete copy of Brown's December 4, 2008 letter is attached as Exhibit 2.

11.  Prior to the December 4, 2008 denial letter, McFadden provided Travelers with evidence of occupancy of 1836 Chelsea by tenant Marcus Smith d/b/a Hi Tech Performance Engine Rebuilders.  A true and complete copy of the license agreement and sales contract between McFadden and Smith is attached as collective Exhibit 3.

12.  On July 23, 2008, Smith reported a theft loss at his business, High Tech Performance Engine Rebuilders, at 1836 Chelsea to the Memphis Police Department.  A true and complete copy of the Memphis Police Department theft report is attached as Exhibit 4.

13.  Smith was unable to get financing to purchase 1836 Chelsea as required by the sales contract with McFadden and vacated the premises in mid to late August, 2008.

14.  Also made available to Travelers prior to the December 4, 2008 denial letter were statements from McFadden employees Stillman McFadden, Ronnie Kiihnl, and Bubba Ross regarding the use and occupancy of the building at 1836 Chelsea by Smith, and his vacating the building, among other matters.

15.  Smith occupied the building and premises at 1836 Chelsea within 60 days of the September 12, 2008 date of loss.

16.  Travelers knew that the building and premises at 1836 Chelsea were not vacant for more than 60 days prior to the September 12, 2008 date of loss.

17.  On December 8, 2008, McFadden's lawyer, not yet having received a copy of the December 4, 2008 denial letter, sent a letter to Travelers demanding that McFadden's claim be

3

Exhibit 1

honored within 60 days pursuant to T.C.A. § 56-7-105.  A true and complete copy of Garrett M.

Estep's December 8, 2008 letter is attached as Exhibit 5.

18.  On December 29, 2008, McFadden's lawyer sent a second letter to Travelers with

additional information asking Travelers to reconsider its wrongful denial of McFadden's claim.

Travelers was also asked to identify any and all policy provisions justifying denial of

McFadden's claim, other than the alleged vacancy of the building and premises for more than 60

days prior to September 12, 2008.  *See* Exhibit 1, p. 4, Section A. 5. d.  A true and complete copy

of Garrett M. Estep's December 29, 2008 letter is attached as Exhibit 6.

19.  Travelers did not formally respond to McFadden's second demand letter of

December 29, 2008.  At no time did Travelers base its denial of McFadden's claim for theft

losses occurring on or about September 12, 2008 on any provision in the Travelers/McFadden

Policy other than the limitation for vacant buildings.  *See* Exhibit 1, p. 4, Section A. 5. d.

Travelers waived, or is estopped from asserting, any other basis for the denial of McFadden's

claim.

20.  Travelers apparently stands by its denial of McFadden's claim based on 1836

Chelsea allegedly being vacant for more than 60 days prior to September 12, 2008, despite

overwhelming evidence to the contrary.

21.  McFadden complied with all terms and conditions of the Travelers/McFadden Policy

necessary to bring legal action against Travelers.  *See* Exhibit 1, p. 39, Section F. 4.

22.  Travelers did not made any good faith attempt to negotiate a prompt, fair, and

equitable settlement with McFadden, despite the fact that liability is reasonably clear.

4

Exhibit 1

**Causes of Action and Damages**

23.  As a direct and proximate result of the above acts and omissions, Travelers' decision to deny McFadden's claim is a breach of contract.

24.  As a direct and proximate result of the above acts and omissions, Travelers breached the duty of good faith and fair dealing it owes to McFadden.  Travelers failed to conduct a full and adequate investigation of McFadden's claim.  Travelers failed to act reasonably promptly in its claims handling.  Travelers failed to reconsider its wrongful denial of McFadden's claim once liability became reasonably clear, if there ever was a doubt.  Travelers failed to negotiate in good faith with McFadden to effectuate a prompt, fair, equitable, and reasonable settlement.

25.  McFadden is entitled to recover from Travelers all compensatory damages allowed pursuant to the Travelers/McFadden Policy including, but not limited to, the value of the damaged and stolen copper and electrical material, equipment, and fixtures, less McFadden's deductible. *See* Exhibit 1, p. 28-29, Section E. 4.

26.  Travelers did not act in good faith, causing McFadden to incur additional expense, loss, and injury including, but not limited to, attorneys' fees and expenses.  As such, Travelers is liable for all interest plus a 25% statutory penalty pursuant to T.C.A. § 56-7-105.

27.  Travelers willfully and knowingly violated Tennessee's Consumer Protection Act, T.C.A. § 47-18-104.  As such, Travelers is liable for treble damages and also McFadden's attorneys' fees, costs, and expenses pursuant to T.C.A. § 47-18-109.

WHEREFORE, the plaintiff, McFadden Communications, LLC, demands judgment against the defendant, The Travelers Indemnity Company of America, in an amount sufficient to compensate it for all insurable losses under the relevant insurance policy, treble damages, the

Exhibit 1

25% statutory penalty, pre- and post-judgment interest, its attorneys' fees, expenses, and costs

incurred herein, and such other relief, both general and specific, to which it may be entitled.

Respectfully submitted,

FARRIS BOBANGO BRANAN, PLC

By: _____

Garrett M. Estep        No. 19078
One Commerce Square, Ste. 2000
Memphis, Tennessee 38103
(901) 259-7100
Counsel for McFadden Communications, LLC

6

Exhibit 1

# BUSINESSOWNERS PROPERTY COVERAGE SPECIAL FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Paragraph G – PROPERTY DEFINITIONS.

## A. COVERAGE

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Form, means the type of property described in this Paragraph **A.1.**, and limited in Paragraph **A.2.**, Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

**a. Building**, meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fences;

(3) Fixtures, including outdoor fixtures;

(4) Retaining walls, whether or not attached;

(5) Permanently attached:

(a) Machinery; and

(b) Equipment;

(6) Outdoor swimming pools;

(7) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings;

(d) Lobby and hallway furnishings;

(e) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(f) Lawn maintenance and snow removal equipment; and

(g) Alarm systems; and

(8) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure; and

(b) Materials, equipment, supplies and temporary structures, on or within 1,000 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

**b. Business Personal Property** located in or on the buildings described in the Declarations or in the open (or in a vehicle) within 1,000 feet of the described premises, including:

(1) Property owned by you and used in your business;

(2) Property of others that is in your care, custody or control;

(3) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you rent, lease or occupy but do not own; and

(b) You acquired or made at your expense but are not permitted to remove; and

(4) "Money" and "Securities".

### 2. Property Not Covered

Unless the following is added by endorsement to this Coverage Form, Covered Property does not include:

MP T1 02 02 05                Copyright, The Travelers Indemnity Company, 2004

EXHIBIT

1

Exhibit 1

BUSINESSOWNERS

a. Aircraft;

b. Automobiles held for sale;

c. Vehicles or self-propelled machines that are:

   (1) Licensed for use on public roads; or

   (2) Operated principally away from the described premises;

   This paragraph does not apply to:

   (1) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

   (2) Vehicles or self-propelled machines, other than autos, you hold for sale; or

   (3) Trailers or semi-trailers, except as provided in the Non-Owned Detached Trailers Coverage Extension.

d. Dams or dikes;

e. Contraband, or property in the course of illegal transportation or trade;

f. The cost of excavating, grading, backfilling or filling (except those costs made necessary due to repair of buildings insured under this Coverage Form from a Covered Cause of Loss), reclaiming or restoring land or water;

g. Water or land whether in its natural state or otherwise (including land on which the property is located), land improvements, growing crops or standing timber;

h. Outdoor trees, shrubs, plants and lawns, other than "stock" except as provided in the Outdoor Trees, Shrubs, Plants and Lawns Coverage Extension.

i. The following property while outside of the buildings:

   (1) Bridges, walks, roadways, patios or other paved surfaces; or

   (2) Outdoor radio or television antennas, (including satellite dishes) and including their lead-in wiring, masts or towers;

   except as provided in the Outdoor Property Coverage Extension;

j. Watercraft (including motors, equipment and accessories) while afloat;

k. Accounts and bills, except as provided in the Accounts Receivable Coverage Extension;

l. "Valuable Papers and Records", except as provided in the Valuable Papers and Records Coverage Extension;

m. Property that is covered under another Coverage Form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

n. "Fine Arts" except as provided in the Fine Arts Additional Coverage;

o. Bullion, gold, silver, platinum and other precious alloys or metals, except if they are used in your "operations" (theft limitation applies);

p. "Electronic Data Processing Equipment" (not including "stock") except as provided in the Electronic Data Processing Coverage Extension;

q. "Electronic Data Processing Data and Media" (not including "stock") except as provided in the Electronic Data Processing Coverage Extension or in the Accounts Receivable Coverage Extension; or

r. Outdoor signs, except as provided in the Signs Coverage Extension.

3. **Business Income and Extra Expense**

   Business Income and Extra Expense is provided at the premises described in the Declarations when the Declarations show that you have coverage for Business Income and Extra Expense.

   a. **Business Income**

      (1) Business Income means:

         (a) Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred, including:

            (i) "Rental Value"; and

            (ii) "Maintenance Fees", if you are a condominium association; and

         (b) Continuing normal operating expenses incurred, including payroll.

      (2) We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be

Exhibit 1

caused by direct physical loss of or damage to property at the described premises. The loss or damage must be caused by or result from a Covered Cause of Loss. With respect to loss of or damage to personal property in the open or personal property in a vehicle, the described premises include the area within 1,000 feet of the site at which the described premises are located.

(3) With respect to the requirements set forth in Paragraph (2) above, if you rent, lease or occupy only part of the site at which the described premises are located, the described premises means:

(a) The portion of the building which you rent, lease or occupy; and

(b) Any area within the building or on the site at which the described premises are located, if that area services, or is used to gain access to, the described premises.

**b. Extra Expense**

(1) Extra Expense means reasonable and necessary expenses you incur during the "period of restoration" that you would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss.

(2) We will pay Extra Expense (other than the expense to repair or replace property) to:

(a) Avoid or minimize the "suspension" of business and to continue "operations" at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or

(b) Minimize the "suspension" of business if you cannot continue "operations".

(3) We will also pay Extra Expense (including Expediting Expenses) to repair or replace the property, but only

to the extent it reduces the amount of loss that otherwise would have been payable under Paragraph **a. Business Income**, above.

**c. Extended Business Income**

If the necessary "suspension" of your "operations" produces a Business Income loss payable under Paragraph **a. Business Income** above, we will also pay for the actual loss of Business Income you sustain during the period that:

(1) Begins on the date property is actually repaired, rebuilt or replaced and "operations" are resumed; and

(2) Ends on the earlier of:

(a) The date you could restore your "operations" with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage occurred; or

(b) Sixty consecutive days after the date determined in Paragraph (1) above.

However, this extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.

**d.** If the Declarations show for Business Income and Extra Expense:

(1) Actual loss for 12 consecutive months, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage; or

(2) Actual loss up to 12 consecutive months subject to a maximum dollar limit, then we will pay for loss of Business Income and Extra Expense that occurs within 12 consecutive months following the date of direct physical loss or damage, subject to the limit shown in any one occurrence.

**4. Covered Causes of Loss**

RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

Exhibit 1

BUSINESSOWNERS

**a.** Limited in Paragraph **A.5.**, Limitations; or

**b.** Excluded in Paragraph **B.**, Exclusions.

**5. Limitations**

**a.** We will not pay for loss of or damage to:

(1) The "interior of any building or structure" or to personal property in the building or structure, caused by rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

(a) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

(b) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

(2) Steam boilers, steam pipes, steam engines, or steam turbines, caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

(3) Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than explosion.

**b.** We will not pay for loss of or damage to the following types of property unless caused by any of the "specified causes of loss" or building glass breakage:

(1) Live animals, birds or fish, and then only if they are killed or their destruction is made necessary.

(2) Fragile articles such as glassware, statuary, marbles, chinaware and porcelains, if broken. This limitation does not apply to:

(a) Glass that is part of the exterior or interior of a building or structure;

(b) Containers of property held for sale; or

(c) Photographic or scientific instrument lenses.

**c.** For loss or damage by "theft", the most we will pay in any one occurrence for the following types of property is:

(1) $2,500 for all furs, fur garments and garments trimmed with fur.

(2) $5,000 for all jewelry, watches, watch movements, jewels, pearls, precious and semi-precious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $500 or less per item.

(3) $2,500 for all patterns, dies, molds and forms.

**d.** We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss, if the building where loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs:

(1) Vandalism;

(2) Sprinkler Leakage, unless you have protected the system against freezing;

(3) Building glass breakage;

(4) Discharge or leakage of water;

(5) "Theft"; or

(6) Attempted "theft".

With respect to Covered Causes of Loss other than those listed in Paragraphs (1) through (6) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

**e.** Coverage for Business Income and Extra Expense does not apply to any loss or increase in loss caused by direct physical loss of or damage to "Electronic Data Processing Data and Media", except as provided in the Interruption of Computer Operations Coverage Extension.

**6. Additional Coverages**

Unless otherwise stated, payments made under the following Additional Coverages are in addition to the applicable Limits of Insurance.

        Copyright, The Travelers Indemnity Company, 2004        **MP T1 02 02 05**

Exhibit 1

BUSINESSOWNERS

a. **Arson and Theft Reward**

(1) We will pay for reasonable expenses you incur for rewards that lead to:

    (a) An arson conviction in connection with a covered fire or explosion loss, or

    (b) A "theft" conviction in connection with a covered "theft" loss.

(2) The most we will pay under this Additional Coverage in connection with a particular loss is $5,000.

b. **Claim Data Expense**

(1) We will pay the reasonable expenses you incur in preparing claim data when we require such data to show the extent of loss. This includes the cost of taking inventories, making appraisals, preparing income statements, and preparing other documentation.

(2) Under this Additional Coverage, we will not pay for:

    (a) Any expenses incurred, directed, or billed by or payable to attorneys, insurance adjusters or their associates or subsidiaries;

    (b) Any costs in connection with Paragraph **E.2.**, Appraisal; or

    (c) Any expenses incurred, directed, or billed by or payable to insurance brokers or agents, or their associates or subsidiaries, without our written consent prior to such expenses being incurred.

(3) The most we will pay for preparation of claim data under this Additional Coverage in any one occurrence is $5,000 regardless of the number of premises involved.

c. **Debris Removal**

(1) We will pay your expense to remove debris of Covered Property, other than outdoor trees, shrubs, plants and lawns as described in the Outdoor Trees, Shrubs, Plants and Lawns Coverage Extension, caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

    (a) Extract "pollutants" from land or water; or

    (b) Remove, restore or replace polluted land or water.

(3) Except as provided in Paragraph **(4)** below, payment for Debris Removal is included within the applicable Limit of Insurance shown in the Declarations. The most we will pay under this Additional Coverage is 25% of:

    (a) The amount we pay for the direct physical loss or damage to Covered Property; plus

    (b) The deductible in this Coverage Form applicable to that loss or damage.

(4) When the debris removal expense exceeds the 25% limitation in Paragraph **(3)** above or when the sum of the debris removal expense and the amount we pay for the direct physical loss of or damage to Covered Property exceeds the applicable Limit of Insurance, we will pay up to an additional $25,000 for debris removal expense in any one *occurrence*, at each described premises.

d. **Employee Dishonesty**

(1) We will pay for loss of or damage to Covered Property resulting directly from "employee dishonesty".

We will pay for loss or damage you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates year to year or period to period.

(2) Paragraphs **B.2.h.** and **B.2.o.** do not apply to this Additional Coverage.

(3) We will not pay for loss resulting from the dishonest acts of any "employee" if coverage for that "employee" was either cancelled or excluded from any previous insurance policy of yours

Exhibit 1

BUSINESSOWNERS

providing "employee dishonesty" coverage.

(4) This Additional Coverage is cancelled as to any "employee" immediately upon discovery by:

(a) You; or

(b) Any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee",

of any fraudulent dishonest act committed by that "employee" before or after being employed by you.

(5) We will pay for covered loss or damage only if discovered no later than one year from the end of the Policy Period.

(6) The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $25,000.

(7) With respect to this Additional Coverage, occurrence means all loss or damage caused by or involving the same "employee(s)" whether the result of a single act or series of acts.

(8) If, during the period of any prior "Employee Dishonesty" insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage, subject to the following:

(a) This insurance became effective at the time of cancellation or termination of the prior insurance; and

(b) The loss or damage would have been covered by this insurance had it been in effect when the acts or events causing the loss or damage were committed or occurred.

(9) The insurance provided under Paragraph (8) above is part of, not in addition to the Limit of Insurance described in Paragraph (6) above and is limited to the lesser of the amount recoverable under:

(a) This Additional Coverage, as of its effective date; or

(b) The prior "Employee Dishonesty" insurance, had it remained in effect.

e. **Expediting Expenses**

(1) In the event of direct physical loss of or damage to Covered Property caused by or resulting from a Covered Cause of Loss, we will pay for the reasonable and necessary additional expenses you incur to make temporary repairs, expedite permanent repairs, or expedite permanent replacement, at the premises sustaining loss or damage. Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation. Expediting expenses do not include expenses you incur for the temporary rental of property or temporary replacement of damaged property.

(2) With respect to this Additional Coverage, "breakdown" to "covered equipment" will not be considered a Covered Cause of Loss, even if otherwise covered elsewhere in this Coverage Form.

(3) The most we will pay under this Additional Coverage in any one occurrence is $25,000, regardless of the number of premises involved.

f. **Fine Arts**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at any described premises, we will pay for direct physical loss of or damage to "fine arts" which are owned by:

(a) You; or

(b) Others and in your care, custody, or control;

caused by or resulting from a Covered Cause of Loss, including while on exhibit, anywhere within the Coverage Territory.

(2) The breakage limitation under Paragraph **A.5.b.(2)** does not apply to this Additional Coverage.

    Copyright, The Travelers Indemnity Company, 2004    **MP T1 02 02 05**

Exhibit 1

(3) The following exclusions apply to this Additional Coverage:

(a) We will not pay for loss or damage caused by or resulting from wear and tear, any quality in the property that causes it to damage or destroy itself, gradual deterioration, insects, birds, rodents or other animals;

(b) We will not pay for loss or damage caused by or resulting from dampness or dryness of atmosphere, or changes in or extremes of temperature;

(c) We will not pay for loss or damage caused by or resulting from any repairing, restoration or retouching process;

(d) We will not pay for loss or damage caused by or resulting from faulty packing;

(e) Paragraph **B.1.b.** Earth Movement;

(f) Paragraph **B.1.c.** Governmental Action;

(g) Paragraph **B.1.d.** Nuclear Hazard;

(h) Paragraph **B.1.f.** War and Military Action;

(i) Paragraph **B.1.g.** Water;

(j) Paragraph **B.1.h.** Neglect; and

(k) Paragraph **B.2.g.**

No other exclusions in Paragraph **B.** Exclusions apply to this Additional Coverage. However, if any exclusions are added by endorsement to this Coverage Form, such exclusions will apply to this Additional Coverage.

(4) The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $25,000, or the amount shown in the Declarations for "fine arts", whichever is greater. This limit applies regardless of the number of premises involved.

g. **Fire Department Service Charge**

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $25,000 in any one occurrence for your

liability for fire department service charges:

(1) Assumed by contract or agreement prior to loss; or

(2) Required by local ordinance.

h. **Fire Protective Equipment Discharge**

(1) If fire protective equipment discharges accidentally or to control a Covered Cause of Loss we will pay your cost to:

(a) Refill or recharge the system with the extinguishing agents that were discharged; and

(b) Replace or repair faulty valves or controls which caused the discharge.

(2) The most we will pay under this Additional Coverage in any one occurrence is $10,000, regardless of the number of premises involved.

i. **Forgery or Alteration**

(1) We will pay for loss resulting directly from "forgery" or alteration of checks, drafts, promissory notes, or similar written promises, orders or directions to pay a sum certain in money that are made or drawn by or drawn upon you, or made or drawn by one acting as an agent or purported to have been so made or drawn.

We will consider signatures that are produced or reproduced electronically, mechanically or by facsimile the same as handwritten signatures.

We will pay for loss that you sustain through acts committed or events occurring during the Policy Period. Regardless of the number of years this insurance remains in force or the number of premiums paid, no Limit of Insurance cumulates from year to year or period to period.

(2) We will not pay for loss resulting from any dishonest or criminal acts committed by you or any of your partners, "employees", "members", "managers", officers, directors or trustees whether acting alone or in collusion with other persons.

Exhibit 1

BUSINESSOWNERS

**(3)** We will pay for covered loss discovered no later than one year from the end of the Policy Period.

**(4)** The most we will pay for loss under this Additional Coverage in any one occurrence is $25,000, regardless of the number of premises involved.

**(5)** With respect to this Additional Coverage, occurrence means all loss caused by any person, or in which that person is concerned or implicated, either resulting from a single act or any number of such acts, whether the loss involves one or more instruments.

**(6)** If, during the period of any prior Forgery or Alteration insurance, you (or any predecessor in interest) sustained loss or damage that you could have recovered under that insurance, except that the time within which to discover loss or damage has expired, we will pay for it under this Additional Coverage provided:

**(a)** This insurance became effective at the time of cancellation or termination of the prior insurance; and

**(b)** The loss would have been covered by this insurance had it been in effect when the acts or events causing the loss were committed or occurred.

**(7)** The insurance provided under Paragraph **(6)** above is part of, and not in addition to the limit described in Paragraph **(4)** above and is limited to the lesser of the amount recoverable under:

**(a)** This Additional Coverage up to the applicable Limit of Insurance under this Coverage Form, as of its effective date; or

**(b)** The prior Forgery or Alteration insurance, had it remained in effect.

**(8)** If you are sued for refusing to pay any covered instrument described in Paragraph **(1)** above on the basis that it has been forged or altered, and you have our written consent to defend against the suit, we will pay for any reasonable legal expenses that you incur and pay in that defense. The amount we will pay for these legal expenses will be part of and not in addition to the limit described in Paragraph **(4)** above.

**j.** **Newly Acquired or Constructed Property**

**(1)** **Buildings**

**(a)** We will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

**(i)** Your:

**a)** New buildings while being built on a premises shown in the Declarations;

**b)** New buildings while being built on newly acquired premises; and

**c)** Materials, equipment, supplies and temporary structures used in connection with such buildings while they are being built; or

**(ii)** Buildings you acquire by purchase or lease at any premises, including those premises shown in the Declarations.

**(b)** The most we will pay for loss of or damage to newly constructed buildings or newly acquired buildings under this Additional Coverage in any one occurrence is $500,000 at each premises.

**(2)** **Business Personal Property**

**(a)** When a Limit of Insurance is shown in the Declarations for Business Personal Property at any described premises, we will pay for direct physical loss of or damage to the following property caused by or resulting from a Covered Cause of Loss:

**(i)** Business Personal Property, including such property that you newly acquire, at a build-

Copyright, The Travelers Indemnity Company, 2004        **MP T1 02 02 05**

Exhibit 1

ing you acquire by purchase or lease at any premises, including those premises shown in the Declarations; and

(ii) Business Personal Property that you newly acquire at a described premises.

(b) The most we will pay for loss of or damage to Business Personal Property under this Additional Coverage in any one occurrence is $250,000 at each premises.

**(3) Period Of Coverage**

(a) With respect to insurance under this Additional Coverage, coverage will end when any of the following first occurs:

(i) This policy expires;

(ii) 180 days expire after you acquire the property or begin to construct the property;

(iii) You report values to us; or

(iv) The property is more specifically insured.

(b) We will charge you additional premium for values reported to us from the date construction begins or you acquire the property.

**k. Ordinance or Law**

(1) In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay for:

(a) Loss in value of the undamaged portion of the building as a consequence of enforcement of the minimum requirements of any ordinance or law that requires the demolition of undamaged parts of the same building;

(b) Demolition cost, meaning the cost to demolish and clear the site of undamaged parts of the same building as a consequence of enforcement of the minimum requirements of any ordinance or law that required demolition of such undamaged property; and

(c) The increased cost of construction, meaning the increased cost to repair, rebuild or construct the

property as a consequence of enforcement of the minimum requirements of any ordinance or law. This increased cost of construction coverage applies only if:

(i) The building is insured for replacement cost;

(ii) The building is repaired, rebuilt or reconstructed; and

(iii) The repaired, rebuilt or reconstructed building is intended for similar occupancy as the current building, unless otherwise required by zoning or land use ordinance or law.

(2) The ordinance or law referred to in this Additional Coverage is an ordinance or Law that:

(a) Regulates the demolition, construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

(b) Is in force at the time of the loss.

(3) We will not pay under this Additional Coverage for:

(a) Loss due to any ordinance or law that:

(i) You were required to comply with before the loss, even if the building was undamaged; and

(ii) You failed to comply with; or

(b) Costs associated with the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

(4) Paragraph **B.1.a.** does not apply to this Additional Coverage.

(5) Subject to the limit described in Paragraph **(6)** below:

(a) The insurance provided under this Additional Coverage for loss in value to the undamaged portion of the building is limited as follows:

Exhibit 1

BUSINESSOWNERS

(i) If Replacement Cost Coverage applies and the building is repaired or replaced on the same or another premises, we will not pay more than the lesser of:

  a) The amount you actually spend to repair, rebuild or reconstruct the undamaged portion of the building; or

  b) The amount it would cost to restore the undamaged portion of the building on the same premises and to the same height, floor area, style and comparable quality of the original undamaged portion of the building; or

(ii) If Replacement Cost Coverage applies and the building is not repaired or replaced, or if Replacement Cost Coverage does not apply, we will not pay more than the actual cash value of the undamaged portion of the building at the time of loss.

(b) We will not pay more for demolition costs than the amount you actually spend to demolish and clear the site of the described premises.

(c) The insurance provided under this Additional Coverage for increased cost of construction is limited as follows:

(i) If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay is the increased cost of construction at the same premises; or

(ii) If the ordinance or law requires relocation to another premises, the most we will pay is the increased cost of construction at the new premises.

(6) The most we will pay for loss under this Additional Coverage for the total of all coverages described in Paragraph (1) above in any one occurrence is $25,000 at each described premises.

l. **Outdoor Trees, Shrubs, Plants and Lawns**

(1) We will pay for direct physical loss of or damage to outdoor trees, shrubs, plants (other than "stock" of trees, shrubs or plants) and lawns located at the described premises caused by or resulting from a Covered Cause of Loss.

(2) The most we will pay for loss or damage under this Additional Coverage in any one occurrence is $3,000 at each described premises.

(3) Debris removal, because of covered loss or damage to outdoor trees, shrubs, plants and lawns, is included within the limits described in Paragraph (2) above.

m. **Pollutant Cleanup and Removal**

(1) We will pay your necessary and reasonable expense to extract "pollutants" from land or water at the described premises, if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a "specified cause of loss" which occurs:

  (a) At the described premises;

  (b) To Covered Property; and

  (c) During the policy period.

(2) The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the "specified cause of loss" occurs.

(3) This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

(4) The most we will pay under this Additional Coverage is $25,000 for the sum of all covered expenses arising

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

out of all Covered Causes of Loss occurring during each separate 12 month period of this policy beginning with the effective date of this policy. This amount applies regardless of the number of premises involved.

**n.  Preservation of Property**

(1) If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for:

(a) Any direct physical loss of or damage to such property while:

(i) Being moved; or

(ii) Temporarily stored at another location only if the loss or damage occurs within 90 days after the property is first moved; and

(b) The costs incurred to:

(i) Remove such property from the described premises; and

(ii) Return such property to the described premises.

(2) Coverage under this Additional Coverage will end when any of the following first occurs:

(a) When the policy is amended to provide insurance at the new location;

(b) The property is returned to the original described premises;

(c) 90 days expire after the property is first moved; or

(d) This policy expires.

(3) Payments under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.

**o.  Temporary Relocation of Property**

(1) If Covered Property is removed from the described premises and stored temporarily at a location you own, lease or operate while the described premises is being renovated or remodeled, we will pay for direct physical loss of or damage to that stored property:

(a) Caused by or resulting from a Covered Cause of Loss;

(b) Up to $50,000 at each temporary location in any one occurrence; and

(c) During the storage period of up to 90 consecutive days but not beyond expiration of this policy.

(2) This Additional Coverage does not apply if the stored property is more specifically insured.

**p.  Water Damage, Other Liquids, Powder or Molten Material Damage**

(1) If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes.

(2) We will not pay the cost to repair any defect to a system or appliance from which the water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire extinguishing equipment if the damage:

(a) Results in discharge of any substance from an automatic fire protection system; or

(b) Is directly caused by freezing.

(3) Payments under this Additional Coverage are subject to and not in addition to the applicable Limit of Insurance.

**7.  Coverage Extensions**

Unless otherwise stated, payments made under the following Coverage Extensions are subject to and not in addition to the applicable Limits of Insurance.

**a.  Accounts Receivable**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss, as described in Paragraph (2) below, due to direct physical loss of or damage to your

Exhibit 1

BUSINESSOWNERS

records of accounts receivable (including those on electronic data processing media) caused by or resulting from a Covered Cause of Loss. Credit card company media will be considered accounts receivable until delivered to the credit card company.

(2) We will pay for:

(a) All amounts due from your customers that you are unable to collect;

(b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

(c) Collection expenses in excess of your normal collection expenses that are made necessary by the loss or damage; and

(d) Other reasonable expenses that you incur to re-establish your records of accounts receivable.

(3) The following exclusions apply to this Coverage Extension:

(a) We will not pay for loss caused by or resulting from bookkeeping, accounting or billing errors or omissions;

(b) We will not pay for loss that requires an audit of records or any inventory computation to prove its factual existence;

(c) We will not pay for loss caused by or resulting from alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property. But this exclusion applies only to the extent of the wrongful giving, taking or withholding;

(d) Paragraph **B.1.b.** Earth Movement;

(e) Paragraph **B.1.c.** Governmental Action;

(f) Paragraph **B.1.d.** Nuclear Hazard;

(g) Paragraph **B.1.f.** War and Military Action;

(h) Paragraph **B.1.g.** Water;

(i) Paragraph **B.1.h.** Neglect; and

(j) Paragraph **B.2.g.**

No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Coverage Form, such exclusions will apply to this Coverage Extension.

(4) The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence while in transit or at a premises other than the described premises is $25,000.

(5) The most we will pay under this Coverage Extension for loss of or damage to records of accounts receivable in any one occurrence at each described premises is $25,000 or the amount shown in the Declarations for Accounts Receivable, whichever is greater.

(6) Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

b. **Appurtenant Buildings and Structures**

(1) When a Limit of Insurance is shown in the Declarations for Building at the described premises, you may extend that insurance to apply to direct physical loss of or damage to incidental appurtenant buildings or structures, within 1,000 feet of that described premises, caused by or resulting from a Covered Cause of Loss.

(2) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to Business Personal Property within incidental appurtenant buildings or structures within 1,000 feet of that described premises, caused by or resulting from a Covered Cause of Loss.

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

(3) Incidental appurtenant buildings or structures include:

(a) Storage buildings;

(b) Carports;

(c) Garages;

(d) Pump houses; or

(e) Above ground tanks;

which have not been specifically described in the Declarations.

(4) The most we will pay for loss or damage under this Coverage Extension in any one occurrence for any combination of loss of or damage to Building and Business Personal Property is $50,000, regardless of the number of described premises involved.

(5) Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

c. **Building Glass**

(1) If:

(a) You are the building owner; and

(b) A Limit of Insurance is shown in the Declarations for Building at the described premises;

you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass breakage and damage to glass by chemicals accidentally or maliciously applied to glass.

(2) If:

(a) You are a tenant;

(b) A Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises; and

(c) You are contractually obligated to repair or replace building glass at the described premises;

you may extend that insurance to apply to direct physical loss of or damage to all exterior and interior building glass caused by or resulting from a Covered Cause of Loss, including glass breakage and damage to glass

by chemicals accidentally or maliciously applied to glass.

(3) We will also pay for necessary expenses in connection with loss or damage covered in Paragraphs (1) or (2) above, incurred by you to:

(a) Put up temporary plates or board up openings;

(b) Repair or replace encasing frames; and

(c) Remove or replace obstructions.

(4) The following exclusions apply to this Coverage Extension:

(a) We will not pay for loss or damage caused by or resulting from:

(i) Wear and tear;

(ii) Hidden or latent defect;

(iii) Corrosion; or

(iv) Rust;

(b) Paragraph **B.1.b.** Earth Movement;

(c) Paragraph **B.1.c.** Governmental Action;

(d) Paragraph **B.1.d.** Nuclear Hazard;

(e) Paragraph **B.1.f.** War and Military Action; and

(f) Paragraph **B.1.g.** Water.

No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Coverage Form, such exclusions will apply to this Coverage Extension.

d. **Business Income and Extra Expense From Dependent Property**

(1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur due to the "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss or damage at the premises of a Dependent Property, caused

Exhibit 1

BUSINESSOWNERS

by or resulting from a Covered Cause of Loss.

**(2)** Dependent Property means property operated by others whom you depend on to:

**(a)** Deliver materials or services (other than "water supply services", "communication supply services" or "power supply services") to you, or to others for your account (Contributing Locations);

**(b)** Accept your products or services (Recipient Locations);

**(c)** Manufacture products for delivery to your customers under contract of sale (Manufacturing Locations); or

**(d)** Attract customers to your business (Leader Locations).

**(3)** With respect to this Coverage Extension, the "period of restoration":

**(a)** Begins 24 hours after the time of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the premises of the Dependent Property;

**(b)** Ends on the date when the property at the premises of the Dependent Property should be repaired, rebuilt or replaced with reasonable speed and similar quality; and

**(c)** Does not include any increased period required due to the enforcement of any ordinance or law that:

**(i)** Regulates the construction, use or repair, or requires the tearing down of any property; or

**(ii)** Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**(4)** This Coverage Extension:

**(a)** Applies to Dependent Property premises located within the Coverage Territory; and

**(b)** Does not apply when you have more specific insurance under any other policy.

**(5)** We will reduce the amount of your Business Income loss, other than Extra Expense, to the extent you can resume "operations" in whole or in part, by using any other available:

**(a)** Source of materials; or

**(b)** Outlet for your products.

**(6)** The most we will pay for Business Income and Extra Expense under this Coverage Extension in any one occurrence is $10,000, regardless of the number of described premises or number of Dependent Properties involved.

**(7)** Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

**e.  Business Income and Extra Expense – Newly Acquired Premises**

**(1)** When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur due to the "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss or damage caused by or resulting from a Covered Cause of Loss at any premises you newly acquire by purchase or lease (other than at fairs, trade shows or exhibitions).

**(2)** The most we will pay under this Coverage Extension for the sum of Business Income and Extra Expense you incur in any one occurrence is $250,000 at each newly acquired premises.

**(3)** Insurance under this Coverage Extension for each newly acquired

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

premises will end when any of the following first occurs:

(a) This policy expires;

(b) 90 days expire after you acquire that premises;

(c) You report that premises to us; or

(d) The Business Income or Extra Expense is more specifically insured.

We will charge you additional premium for premises reported from the date you acquire that premises.

(4) Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

**f. Business Personal Property Off Premises**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to such property caused by or resulting from a Covered Cause of Loss while:

(a) In the course of transit to or from the described premises; or

(b) Temporarily away from the described premises, and:

(i) At a premises you do not own, lease or operate; or

(ii) At any fair, trade show or exhibition at a premises you do not own or regularly occupy.

(2) This Coverage Extension does not apply to property:

(a) While in the custody of the United States Postal Service;

(b) Rented or leased to others;

(c) After delivery to customers;

(d) In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition;

(e) Temporarily at a premises for more than 60 consecutive days, except "money" and "securities" at a "banking premises";

(f) Otherwise covered under the Fine Arts Additional Coverage; or

(g) Otherwise covered under the following Coverage Extensions:

(i) Accounts Receivable;

(ii) Electronic Data Processing;

(iii) Personal Effects; or

(iv) Valuable Papers and Records.

**g. Civil Authority**

(1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to the actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur caused by action of civil authority that prohibits access to the described premises. The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, that are within 100 miles of the described premises, caused by or resulting from a Covered Cause of Loss.

(2) The coverage for Business Income will begin 24 hours after the time of that action and will apply for a period of three consecutive weeks after coverage begins.

(3) The coverage for Extra Expense will begin immediately after the time of that action and will end when your Business Income coverage ends for this Coverage Extension.

**h. Electronic Data Processing**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to "Electronic Data Processing Equipment" and to "Electronic Data Processing Data and Media", caused by or resulting from a Covered Cause of Loss.

(2) Worldwide coverage is provided under this Coverage Extension. The coverage territory as described in

Exhibit 1

BUSINESSOWNERS

Paragraph **F.8.b.** does not apply to this Coverage Extension.

**(3)** This Coverage Extension does not apply to:

**(a)** "Stock"; or

**(b)** Property that is leased or rented to others.

**(4)** The following exclusions as described in Paragraph **B.** Exclusions do not apply to this Coverage Extension:

**(a)** Paragraph **1.e.** Utility Services;

**(b)** Paragraph **2.a.**; or

**(c)** Paragraph **2.d.(6).**

**(5)** The following additional exclusions apply to this Coverage Extension:

**(a)** We will not pay for loss or damage caused by or resulting from any of the following:

**(i)** Programming errors, omissions or incorrect instructions to a machine. But if programming errors, omissions or incorrect instructions to a machine results in a "specified cause of loss" or mechanical breakdown of "Electronic Data Processing Equipment", we will pay for the loss or damage caused by that "specified cause of loss" or mechanical breakdown of "Electronic Data Processing Equipment";

**(ii)** Unauthorized viewing, copying or use of "Electronic Data Processing Data and Media" (or any proprietary or confidential information or intellectual property) by any person, even if such activity is characterized as "theft";

**(iii)** Errors or deficiency in design, installation, maintenance, repair or modification of your computer systems or any computer system or network to which your system is connected or on which your system depends (including electronic data). But if errors or

deficiency in design, installation, maintenance, repair or modification of your computer system or any computer system or network to which your system is connected or on which your system depends (including electronic data) results in a "specified cause of loss" or mechanical breakdown of "Electronic Data Processing Equipment", we will pay for the loss or damage caused by that "specified cause of loss" or mechanical breakdown of "Electronic Data Processing Equipment";

**(iv)** Unexplained or indeterminable failure, malfunction or slowdown of a computer system, including "Electronic Data Processing Data and Media" or the inability to access or properly manipulate "Electronic Data Processing Data and Media"; or

**(v)** "Electronic Vandalism" except as provided in Paragraph **(9)** below.

**(6)** The most we will pay under this Coverage Extension for loss of or damage to "Electronic Data Processing Equipment" and to "Electronic Data Processing Data and Media", while in transit or at a premises other than the described premises, in any one occurrence, is $25,000.

**(7)** The most we will pay under this Coverage Extension for loss of or damage to duplicates of your "Electronic Data Processing Data and Media" while stored at a separate premises from where your original "Electronic Data Processing Data and Media" are kept, in any one occurrence, is $25,000.

**(8)** The most we will pay under this Coverage Extension for loss or damage to "Electronic Data Processing Equipment", including such property you newly acquire in any one occurrence is $25,000 at each newly acquired premises. With respect to insurance

Exhibit 1

BUSINESSOWNERS

under this Coverage Extension on newly acquired "Electronic Data Processing Equipment", coverage will end when any of the following first occurs:

**(a)** This policy expires;

time and are the result of the same cause will also be considered one "breakdown".

**(2)** Under this Coverage Extension, the following coverages also apply:

**(a)** Expediting Expenses

Exhibit 1

BUSINESSOWNERS

under this Coverage Extension on newly acquired "Electronic Data Processing Equipment", coverage will end when any of the following first occurs:

(a) This policy expires;

(b) 180 days expire after you acquire the "Electronic Data Processing Equipment"; or

(c) You report values to us.

(9) The most we will pay under this Coverage Extension for loss of or damage to "Electronic Data Processing Data and Media" caused by or resulting from "electronic vandalism", in any one occurrence is $25,000, regardless of the number of the number of premises involved. Such limit also applies to any otherwise covered loss of Business Income or Extra Expense.

(10) The most we will pay under this Coverage Extension for loss of or damage to "Electronic Data Processing Equipment" and to "Electronic Data Processing Data and Media", at the described premises, in any one occurrence, is the Limit of Insurance shown in the Declarations for Business Personal Property at such premises or $50,000, whichever is less.

i. **Equipment Breakdown**

(1) When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to Covered Property at the described premises caused by or resulting from a "breakdown" to "covered equipment".

With respect to otherwise covered Business Income and Extra Expense, "breakdown" to "covered equipment" will be considered a Covered Cause of Loss.

If an initial "breakdown" causes other "breakdowns", all will be considered one "breakdown". All "breakdowns" that manifest themselves at the same

time and are the result of the same cause will also be considered one "breakdown".

(2) Under this Coverage Extension, the following coverages also apply:

(a) Expediting Expenses

(i) In the event of direct physical loss of or damage to Covered Property caused by or resulting from a "breakdown" to "covered equipment", we will pay for the reasonable additional expenses you necessarily incur to make temporary repairs to, or expedite the permanent repair or replacement of, the lost or damaged Covered Property.

(ii) Expediting expenses include overtime wages and the extra cost of express or other rapid means of transportation.

(iii) The most we will pay under this Coverage Extension for all Expediting Expenses arising out of any one "breakdown" is $25,000. This limit is part of and not in addition to the Limit of Insurance that applies to lost or damaged Covered Property.

(b) "Pollutants"

(i) In the event of direct physical loss of or damage to Covered Property caused by or resulting from a "breakdown" to "covered equipment", we will pay for the additional cost to repair or replace Covered Property because of contamination by "pollutants". This includes the additional expenses to clean up or dispose of such property. Additional costs mean those beyond what would have been required had no "pollutants" been involved.

(ii) The most we will pay under this Coverage Extension for loss or damage to Covered Property caused by contamination by "pollutants" arising

Exhibit 1

BUSINESSOWNERS

out of any one "breakdown" is $25,000. This limit is subject to and not in addition to the Limit of Insurance that applies to lost or damaged Covered Property.

(c) Service Interruption

When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to loss caused by or resulting from a "breakdown" to equipment that is owned, operated or controlled by a local public or private utility or distributor that directly generates, transmits, distributes or provides the following utility services:

(i) "Water Supply Services";

(ii) "Communication Supply Services"; or

(iii) "Power Supply Services".

(3) We will not pay under this Coverage Extension for loss or damage caused by or resulting from any of the following tests:

(a) A hydrostatic, pneumatic or gas pressure test of any boiler or pressure vessel; or

(b) An insulation breakdown test of any type of electrical equipment.

(4) We will not pay under this Coverage Extension for loss or damage caused by or resulting from a change in:

(a) Temperature; or

(b) Humidity;

as a consequence of "breakdown" to "covered equipment".

(5) The following limitations in Paragraph A.5. do not apply to this Coverage Extension:

(a) Paragraph a.(2); and

(b) Paragraph a.(3).

(6) The following exclusions in Paragraph B. Exclusions do not apply to this Coverage Extension:

(a) Paragraph 2.a.;

(b) Paragraph 2.d.(6); and

(c) Paragraph 2.e.

(7) With respect to this Coverage Extension, the following condition is added to Paragraph F. Commercial Property Conditions:

**Suspension**

If any "covered equipment" is found to be in, or exposed to a dangerous condition, any of our representatives may immediately suspend the insurance provided by this Coverage Form for loss or damage caused by or resulting from a "breakdown" to that "covered equipment". This can be done by delivering or mailing a notice of suspension to:

1. Your last known address; or

2. The address where the "covered equipment" is located.

Once suspended in this way, such insurance can only be reinstated by a written endorsement issued by us. If we suspend your insurance, you will get a pro rata refund of premium for that "covered equipment". But the suspension will be effective even if we have not yet made or offered a refund.

(8) The most we will pay under this Coverage Extension for all direct physical loss of or damage to:

(a) "Diagnostic Equipment";

(b) "Power Generating Equipment"; or

(c) "Production Equipment";

caused by or resulting from a "breakdown" to "covered equipment" in any one occurrence is $100,000.

j. **Interruption of Computer Operations**

(1) When the Declarations show that you have coverage for Business Income and Extra Expense, you may extend that insurance to apply to a "suspension" of "operations" caused by an interruption of computer operations due to direct physical loss of or damage to "Electronic Data Processing Data and Media" at the described premises caused by or resulting from a Covered Cause of Loss.

   Copyright, The Travelers Indemnity Company, 2004   MP T1 02 02 05

Exhibit 1

**(2)** The most we will pay under this Coverage Extension is $25,000 for the sum of all covered interruptions arising out of all Covered Causes of Loss occurring during each separate 12 month period of this policy beginning with the effective date of this policy.

**(3)** Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

**k. Money Orders and Counterfeit Paper Currency**

When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to loss due to the good faith acceptance of:

**(1)** Any U.S. or Canadian post office or express money order, issued or purporting to have been issued by any post office or express company, if the money order is not paid upon presentation; or

**(2)** Counterfeit United States or Canadian paper currency;

in exchange for merchandise, "money" or services or as part of a normal business transaction.

**l. Non-Owned Detached Trailers**

**(1)** When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to trailers or semi-trailers that you do not own, provided that:

**(a)** The trailer or semi-trailer is used in your business;

**(b)** The trailer or semi-trailer is in your care, custody or control at the described premises; and

**(c)** You have a contractual responsibility to pay for loss of or damage to the trailer or semi-trailer.

**(2)** We will not pay for loss or damage that occurs:

**(a)** While the trailer or semi-trailer is attached to any motor vehicle or motorized conveyance, whether

or not the motor vehicle or motorized conveyance is in motion; or

**(b)** During hitching or unhitching operations, or when a trailer or semi-trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $5,000 regardless of the number of described premises, trailers or semi-trailers involved.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

**m. Ordinance or Law – Increased Period of Restoration**

**(1)** When:

**(a)** A Covered Cause of Loss occurs to property at the described premises; and

**(b)** The Declarations show that you have coverage for Business Income and Extra Expense;

you may extend that insurance to apply to the amount of actual loss of Business Income you sustain and reasonable and necessary Extra Expense you incur during the increased period of "suspension" of "operations" caused by or resulting from the enforcement of any ordinance or law that:

**(a)** Regulates the construction, repair or replacement of any property;

**(b)** Requires the tearing down or replacement of any parts of property not damaged by a Covered Cause of Loss; and

**(c)** Is in force at the time of loss.

**(2)** This Coverage Extension applies only to the period that would be required, with reasonable speed, to reconstruct, repair or replace the property to comply with the minimum requirements of the ordinance or law.

**(3)** This Coverage Extension does not apply to:

Exhibit 1

BUSINESSOWNERS

(a) Loss due to an ordinance or law that:

(i) You were required to comply with before the loss, even if the property was undamaged; and

(ii) You failed to comply with; or

(b) Costs associated with the enforcement of any ordinance or law that requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

(4) Paragraph **B.1.a.**, does not apply to this Coverage Extension.

(5) The most we will pay for loss under this Coverage Extension in any one occurrence is $25,000 at each described premises.

(6) Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

**n. Outdoor Property**

(1) When a Limit of Insurance is shown in the Declarations for Building or Business Personal Property at the described premises, you may extend that insurance to apply to direct physical loss of or damage to the following types of outdoor property at that described premises caused by or resulting from a Covered Cause of Loss:

(a) Radio or television antennas (including microwave or satellite dishes) and their lead-in wiring, masts or towers; or

(b) Bridges, walks, roadways, patios and other paved surfaces.

(2) The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $10,000 at each described premises.

**o. Personal Effects**

(1) When a Limit of Insurance is shown in the Declarations for Business Personal Property at the described premises, you may extend that insurance

to apply to direct physical loss of or damage to personal effects owned by:

(a) You; or

(b) Your officers, partners, "members", "managers", "employees", directors or trustees;

caused by or resulting from a Covered Cause of Loss.

(2) Such property must be located at a described premises.

(3) The most we will pay for loss or damage under this Coverage Extension in any one occurrence is $25,000 at each described premises.

(4) Payments under this Coverage Extension are in addition to the applicable Limits of Insurance.

**p. Signs**

(1) If:

(a) You are the building owner; and

(b) A Limit of Insurance is shown in the Declarations for Building;

at the described premises, you may extend that insurance to apply to direct physical loss of or damage to outdoor signs attached to the building, or on or within 1,000 feet of the described premises, caused by or resulting from a Covered Cause of Loss.

(2) If:

(a) You are a tenant;

(b) A Limit of Insurance is shown in the Declarations for Business Personal Property; and

(c) You own or are contractually obligated to repair or replace outdoor signs;

at the described premises, you may extend that insurance to apply to direct physical loss of or damage to outdoor signs attached to the building, or on or within 1,000 feet of the described premises, caused by or resulting from a Covered Cause of Loss.

Copyright, The Travelers Indemnity Company, 2004          **MP T1 02 02 05**

Exhibit 1

q.  **Spoilage – Consequential Loss**

  (1) When a Limit of Insurance is shown
      in the Declarations for Business Per-
      sonal Property at the described prem-
      ises, you may extend that insurance
      to apply to consequential loss to your
      Business Personal Property caused
      by a change in:

      (a) Temperature; or

      (b) Humidity;

      caused by or resulting from a Cov-
      ered Cause of Loss to any of the fol-
      lowing types of equipment situated
      within the building at the described
      premises:

      (a) Refrigerating;

      (b) Cooling;

      (c) Humidifying;

      (d) Air-conditioning;

      (e) Heating;

      (f) Generating or converting power;
          or

      (g) Connections, supply or transmis-
          sion lines and pipes associated
          with the above equipment.

  (2) With respect to this Coverage Exten-
      sion, "breakdown" to "covered equip-
      ment" will not be considered a Cov-
      ered Cause of Loss, even if otherwise
      covered elsewhere in this Coverage
      Form.

  (3) Paragraphs **B.2.d.(7)(a)** and
      **B.2.d.(7)(b)** do not apply to this Cov-
      erage Extension.

r.  **Theft Damage to Rented Property**

  (1) When a Limit of Insurance is shown
      in the Declarations for Business Per-
      sonal Property at the described prem-
      ises, you may extend that insurance
      to apply to direct physical loss of or
      damage to the following caused by or
      resulting by "theft" or attempted
      "theft":

      (a) That part of a building you oc-
          cupy, but do not own, which con-
          tains Covered Property; and

      (b) Property within such non-owned
          building used for maintenance or

service of such non-owned build-
ing.

  (2) We will not pay under this Coverage
      Extension for loss or damage:

      (a) Caused by or resulting from fire
          or explosion; or

      (b) To glass (other than glass build-
          ing blocks) or to any lettering, or-
          namentation or burglar alarm
          tape on glass.

  (3) This Coverage Extension applies only
      if you are a tenant and you are con-
      tractually obligated to insure this ex-
      posure.

s.  **Valuable Papers and Records**

  (1) When a Limit of Insurance is shown
      in the Declarations for Business Per-
      sonal Property at the described prem-
      ises, you may extend that insurance
      to apply to direct physical loss of or
      damage to "valuable papers and re-
      cords", that:

      (a) You own; or

      (b) Are owned by others, but in your
          care, custody or control;

      caused by or resulting from a Cov-
      ered Cause of Loss.

  (2) This Coverage Extension includes
      the cost to research, replace or re-
      store the lost information on "valuable
      papers and records" for which dupli-
      cates do not exist.

  (3) The following exclusions apply to this
      Coverage Extension:

      (a) We will not pay for any loss or
          damage to "valuable papers and
          records" caused by or resulting
          from any errors or omissions in
          processing or copying. But if er-
          rors or omissions in processing or
          copying results in fire or explo-
          sion, we will pay for the resulting
          loss or damage caused by that
          fire or explosion.

      (b) Paragraph **B.1.b.** Earth Move-
          ment;

      (c) Paragraph **B.1.c.** Governmental
          Action;

      (d) Paragraph **B.1.d.** Nuclear Haz-
          ard;

BUSINESSOWNERS

(e) Paragraph **B.1.f.** War and Military Action;

(f) Paragraph **B.1.g.** Water;

(g) Paragraph **B.1.h.** Neglect; and

(h) Paragraph **B.2.g.**

No other exclusions in Paragraph **B.** Exclusions apply to this Coverage Extension. However, if any exclusions are added by endorsement to this Coverage Form, such exclusions will apply to this Coverage Extension.

(4) The most we will pay under this Coverage Extension for loss of or damage to "valuable papers and records" in any one occurrence while in transit or at a premises other than the described premises is $25,000.

(5) The most we will pay under this Coverage Extension for loss of or damage to "valuable papers and records" in any one occurrence at each described premises is $25,000 or the amount shown in the Declarations for Valuable Papers and Records, whichever is greater.

(6) Payments made under this Coverage Extension are in addition to the applicable Limits of Insurance.

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

   **a. Ordinance or Law**

   (1) The enforcement of any ordinance or law:

      (a) Regulating the construction, use or repair of any property; or

      (b) Requiring the tearing down of any property, including the cost of removing its debris.

   (2) This exclusion, Ordinance or Law, applies whether the loss results from:

      (a) An ordinance or law that is enforced even if the property has not been damaged; or

      (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased; or

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface;

   all whether naturally occurring or due to man made or other artificial causes.

   But if Earth Movement, as described in Paragraphs (1) through (4) above results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire or volcanic action, we will pay for the loss or damage caused by that fire or volcanic action.

   Volcanic action means direct loss or damage resulting from the eruption of a volcano, when the loss or damage is caused by:

      (a) Airborne volcanic blast or airborne shock waves;

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

(b) Ash, dust, or particulate matter; or

(c) Lava flow.

All volcanic eruptions that occur within any 168–hour period will constitute a single occurrence.

Volcanic action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss of or damage to Covered Property.

**c. Governmental Action**

Seizure or destruction of property by order of governmental authority.

But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and done at the time of a fire to prevent its spread, if the fire would be covered under this policy.

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure or fluctuation of power or other utility service supplied to the described premises, however caused, if the cause of the failure or fluctuation occurs away from the described premises.

But if the failure or fluctuation of power or other utility service results in a Covered Cause of Loss, we will pay for the loss or damage resulting from that Covered Cause of Loss.

**f. War and Military Action**

(1) War, including undeclared or civil war;

(2) Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

(3) Insurrection, rebellion, revolution, usurped power or action taken by

governmental authority in hindering or defending against any of these.

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

(3) Water or sewage that backs up or overflows from a sewer, drain or sump; or

(4) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floors or paved surfaces;

(b) Basements, whether paved or not; or

(c) Doors, windows or other openings;

all whether naturally occurring or due to man made or other artificial causes.

But if Water, as described in Paragraphs (1) through (4) above results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. Neglect**

Neglect of an insured to use reasonable means to save and preserve property from further damage at and after the time of loss.

**i. Collapse of Buildings**

Collapse of buildings meaning an abrupt falling down or caving in of a building or any part of a building with the result being that the building or part of a building cannot be occupied for its intended purpose.

(1) This exclusion does not apply to collapse of buildings if caused only by one or more of the following:

(a) A "specified cause of loss" or breakage of building glass;

(b) Decay, insect or vermin damage that is hidden from view, unless the presence of such decay or insect or vermin damage is known to an insured prior to collapse;

Exhibit 1

BUSINESSOWNERS

(c) Weight of people or personal property;

(d) Weight of rain that collects on a roof; or

(e) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation; or

(f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs after construction, remodeling, or renovation is complete and is caused in part by a cause of loss listed in Paragraphs **(a)** through **(d)** above.

In the event collapse results in a Covered Cause of Loss, we will only pay for the resulting loss or damage by that Covered Cause of Loss.

(2) We will not pay for loss of or damage to the following types of property, if otherwise covered in this Coverage Form under Paragraphs **(1)(b)** through **(1)(f)** above, unless the loss or damage is a direct result of the collapse of a building:

(a) Awnings, gutters and downspouts;

(b) Outdoor radio or television antennas (including microwave or satellite dishes) and their lead-in wiring, masts or towers;

(c) Fences;

(d) Piers, wharves and docks;

(e) Beach or diving platforms or appurtenances;

(f) Retaining walls;

(g) Walks, roadway and other paved surfaces;

(h) Yard fixtures; or

(i) Outdoor swimming pools.

(3) A building or part of a building that:

(a) Is in imminent danger of abruptly falling down or caving in; or

(b) Suffers a substantial impairment of structural integrity;

is not considered to have collapsed but is considered to be in a state of imminent collapse.

(4) With respect to buildings in a state of imminent collapse, we will not pay for loss or damage unless the state of imminent collapse first manifests itself during the policy period and is caused only by one or more of the following which occurs during the policy period:

(a) A "specified cause of loss" or breakage of glass;

(b) Weight of people or personal property;

(c) Weight of rain that collects on a roof; or

(d) Use of defective material or methods in construction, remodeling or renovation if the state of imminent collapse occurs during the course of construction, remodeling or renovation.

2. We will not pay for loss or damage caused by or resulting from any of the following:

a. Artificially generated electrical current, including electric arcing that disturbs electrical devices, appliances or wires unless caused by a "specified cause of loss".

But if artificially generated electrical current results in fire, we will pay for the loss or damage caused by that fire.

b. Delay, loss of use or loss of market.

c. Smoke, vapor or gas from agricultural smudging or industrial operations.

d. (1) Wear and tear;

(2) Rust, corrosion, fungus, decay, deterioration, wet or dry rot, mold, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals;

Exhibit 1

**(6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision;

**(7)** The following causes of loss to personal property:

**(a)** Dampness or dryness of atmosphere;

**(b)** Changes in or extremes of temperature;

**(c)** Marring or scratching;

**(d)** Changes in flavor, color, texture or finish;

**(e)** Evaporation or leakage; or

**(8)** Contamination by other than "pollutants".

But if an excluded cause of loss that is listed in Paragraphs **(1)** through **(8)** above results in a "specified cause of loss", building glass breakage or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss), we will pay for the loss or damage caused by that "specified cause of loss", building glass breakage or "breakdown" to "covered equipment" (only if otherwise a Covered Cause of Loss).

**e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**f.** Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

**g.** Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protection sys-

tems) caused by or resulting from freezing, unless:

**(1)** You do your best to maintain heat in the building or structure; or

**(2)** You drain the equipment and shut off the water supply if the heat is not maintained.

**h.** Dishonest or criminal acts by you, or any of your partners, "members", officers, "managers", "employees" (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

**(1)** Acting alone or in collusion with others; or

**(2)** Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your "employees" (including leased employees), but "theft" by "employees" (including leased employees) is not covered.

**i.** Voluntary parting with any property by you or anyone else to whom you have entrusted the property.

**j.** Rain, snow, sand, dust, ice or sleet to personal property in the open.

**k.** Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, **k.** does not apply to damage to glass caused by chemicals applied to the glass.

**l.** Default on any credit sale, loan, or similar transaction.

**m.** Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property. This exclusion does not apply to "money" and "securities".

Exhibit 1

BUSINESSOWNERS

n. Loss of property or that part of any loss, the proof of which as to its existence or amount is dependent on:

(1) Any inventory computation; or

(2) A profit and loss computation.

o. The transfer of property to a person or to a place outside the described premises on the basis of unauthorized instructions.

p. Loss of "money" or "securities" caused by or resulting from accounting or arithmetic errors or omissions.

q. The cost of correcting or making good the damage to personal property attributable to such property being processed, manufactured, tested, repaired, restored, retouched or otherwise being worked upon.

3. We will not pay for loss or damage caused by or resulting from any of the following under Paragraphs a. through c. But if an excluded cause of loss that is listed in Paragraphs a. and b. below results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss.

a. Weather conditions, but this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph **B.1.** above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

If an excluded cause of loss that is listed in Paragraphs **(1)** through **(4)** above results in a Covered Cause of Loss, we will pay for the resulting loss or damage caused by that Covered Cause of Loss. But we will not pay for:

(1) Any cost of correcting or making good the fault, inadequacy or defect itself, including any cost incurred to tear down, tear out, repair or replace any part of any property to correct the fault, inadequacy or defect; or

(2) Any resulting loss or damage by a Covered Cause of Loss to the property that has the fault, inadequacy or defect until the fault, inadequacy or defect is corrected.

4. **Business Income and Extra Expense Exclusions**

We will not pay for:

a. Any Extra Expense, or increase of Business Income loss, caused by or resulting from:

(1) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference by strikers or other persons at the location of the rebuilding, repair or replacement; or

(2) Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and the period of Extended Business Income; or

b. Any other consequential loss.

C. **LIMITS OF INSURANCE**

1. The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations, Schedules, Coverage Forms, or endorsements.

2. **Inflation Guard**

a. When a percentage for Inflation Guard is shown in the Declarations, the Limit of Insurance for property to which this coverage applies will automatically increase by that annual percentage.

b. The amount of increase will be:

(1) The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, multiplied by

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

(2) The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), multiplied by

(3) The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

Example:

If:

| | |
|---|---|
| The applicable Building limit is | $100,000 |
| The annual percentage increase is | 8% |
| The number of days since the beginning of the policy year (or last policy change) is | 146 |
| The amount of increase is | |
| $100,000 x .08 x (146/365) = | $3,200 |

**3. Business Personal Property Limit – Seasonal Increase**

**a.** The Limit of Insurance for Business Personal Property shown in the Declarations will automatically increase by 25% to provide for seasonal variations.

**b.** This increase will apply only if the Limit of Insurance shown for Business Personal Property in the Declarations is at least 100% of your average monthly values during the lesser of:

(1) The 12 months immediately preceding the date the loss or damage occurs; or

(2) The period of time you have been in business as of the date the loss or damage occurs.

**D. DEDUCTIBLES**

**1.** We will not pay for loss or damage in any one occurrence until the amount of loss or damage exceeds the Businessowners Property Coverage Deductible shown in the Declarations. We will then pay the amount of covered loss or damage in excess of that Deductible. But we will not pay more than the applicable Limit of Insurance.

**2.** Regardless of the amount of the Businessowners Property Coverage Deductible, the most we will deduct from any loss or damage under the Building Glass Coverage Extension

in any one occurrence is the Building Glass Deductible shown in the Declarations.

**3.** The Businessowners Property Coverage Deductible does not apply to any of the following:

**a.** Fire Department Service Charge;

**b.** Business Income and Extra Expense;

**c.** Arson and Theft Reward; and

**d.** Accounts Receivable.

**4.** If more than one deductible applies to loss or damage in any one occurrence, we will apply each deductible separately. But the total of all deductible amounts applied in any one occurrence will not exceed the largest applicable deductible.

**E. PROPERTY LOSS CONDITIONS**

The following conditions apply in addition to the Common Policy Conditions:

**1. Abandonment**

There can be no abandonment of any property to us.

**2. Appraisal**

If we and you disagree on the value of the property, the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property, the amount of Net Income and operating expense or the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

**a.** Pay its chosen appraiser; and

**b.** Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

**3. Duties in the Event of Loss or Damage**

**a.** You must see that the following are done in the event of loss or damage to Covered Property:

(1) Notify the police if a law may have been broken. This duty does not ap-

Exhibit 1

BUSINESSOWNERS

ply to loss or damage arising from "employee dishonesty" and "forgery" or alteration.

(2) Give us prompt notice of the loss or damage. Include a description of the property involved.

(3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

(5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

(6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

(7) For loss or damage from other than "employee dishonesty" or "forgery" or alteration send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) For loss or damage resulting from "employee dishonesty" or "forgery" or alteration, give us a detailed, sworn proof of loss within 120 days after you discover a loss or situation that

may result in loss of or damage to Covered Property.

(9) Cooperate with us in the investigation and settlement of the claim.

(10) If you intend to continue your business, you must resume all or part of your "operations" as quickly as possible.

b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment – Building and Personal Property**

a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cost of repairing or replacing the lost or damaged property, subject to Paragraph **b.** below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to Paragraph **b.** below.

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of Paragraph **e.** below or any applicable provision which amends or supersedes these valuation conditions.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property, except as provided in the Ordinance or Law Additional Coverage.

c. We will give notice of our intentions within 30 days after we receive the proof of loss.

d. We will not pay you more than your financial interest in the Covered Property.

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

e.  We will determine the value of Covered Property in the event of covered loss or damage as follows:

(1)  At replacement cost (without deduction for depreciation), except as provided in Paragraphs (2) through (18) below.

(a)  You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim on a replacement cost basis if you notify us of your intent to do so within 180 days after the loss or damage.

(b)  We will not pay on a replacement cost basis for any loss or damage:

(i)  Until the lost or damaged property is actually repaired or replaced; and

(ii)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

With respect to tenants' improvements and betterments, the following also applies:

a)  If the conditions in Paragraphs (i) and (ii) above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth under Paragraph e.(7) below; and

b)  We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

(c)  We will not pay more for loss or damage on a replacement cost basis than the least of Paragraphs (i), (ii) or (iii) subject to Paragraph (d) below:

(i)  The Limit of Insurance applicable to the lost or damaged property;

(ii)  The cost to replace the lost or damaged property with other property:

a)  Of comparable material and quality; and

b)  Used for the same purpose; or

(iii)  The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in Paragraph (ii) above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

(d)  The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

(2)  If the Declarations indicate that Actual Cash Value applies to Buildings or Business Personal Property, Paragraph (1) above does not apply to the property for which Actual Cash Value is indicated.

(3)  Personal Property of others at the amount for which you are liable plus the cost of labor, materials or services furnished or arranged by you on personal property of others, not to exceed the replacement cost.

(4)  The following property at actual cash value:

(a)  Used or second-hand merchandise held in storage or for sale;

(b)  Household furnishings; and

(c)  Personal effects.

(5)  "Fine Arts" as follows:

(a)  If there is a schedule of "fine arts" on file which includes a description and value of the lost or damaged item, we will pay the value as stated in the schedule for that

Exhibit 1

BUSINESSOWNERS

item if there is a total loss to that item. If there is a partial loss to an item, we will pay the cost of reasonably restoring or repairing that item.

(b) For "fine arts" without a schedule on file as described in Paragraph (a) above, the value of "fine arts" will be the least of the following amounts:

(i) Market value of the lost or damaged item at the time and place of loss;

(ii) The cost of reasonably restoring the lost or damaged item; or

(iii) The cost of replacing that lost or damaged item with property substantially the same.

(6) Glass at the cost of replacement with safety glazing material if required by law.

(7) Tenants' Improvements and Betterments at:

(a) Replacement cost if you make repairs promptly.

(b) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(i) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(ii) Divide the amount determined in Paragraph (i) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(c) Nothing, if others pay for repairs or replacement.

(8) "Valuable Papers and Records" at the cost of restoration or replacement. To the extent that the contents of the "valuable papers and records"

are not restored or replaced, the "valuable papers and records" will be valued at the cost of replacement with blank material of substantially identical type.

(9) "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

(10) Property in transit (other than "stock" you have sold) at the amount of invoice, including your prepaid or advanced freight charges and other charges which may have accrued or become legally due from you since the shipment. If you have no invoice, actual cash value will apply.

(11) "Money" at its face value.

(12) "Securities" at their value at the close of business on the day the loss is discovered.

(13) Accounts Receivable as follows:

(a) If you cannot accurately establish the amount of Accounts Receivable outstanding as of the time of loss, we will:

(i) Determine the total of the average monthly amounts of Accounts Receivable for the 12 months immediately preceding the month in which the loss occurs; and

(ii) Adjust that total for any normal fluctuations in the amount for Accounts Receivable for the month in which the loss occurred or for any demonstrated variance from the average for that month.

(b) If you can accurately establish the amount of Accounts Receivable outstanding, that amount will be used in the determination of loss.

(c) The following will be deducted from the total amount of Accounts Receivable, however that amount is established:

(i) The amount of the accounts for which there was no loss;

Copyright, The Travelers Indemnity Company, 2004          **MP T1 02 02 05**

Exhibit 1

(ii) The amount of the accounts that you are able to re-establish or collect;

(iii) An amount to allow for prob-able bad debts that you are normally unable to collect; and

(iv) All unearned interest and service charges.

(14) "Electronic Data Processing Equip-ment" at replacement cost as of the time and place of loss, without deduc-tion for physical deterioration, depre-ciation, obsolescence or depletion. However, in the event replacement of "Electronic Data Processing Equip-ment" with identical property is im-possible, the replacement cost will be the cost of items that are similar to the damaged or destroyed equipment and intended to perform the same function, but which may include tech-nological advances.

"Electronic Data Processing Equip-ment" that is obsolete or no longer used by you will be valued at actual cash value.

(15) "Electronic Data Processing Data and Media" for which duplicates do not exist will be valued as follows:

(a) The cost of blank media; and

(b) Your cost to research, replace or restore the lost electronic data on lost, damaged or destroyed "Electronic Data Processing Data and Media" but only if the lost electronic data is actually re-placed or restored.

(16) Duplicate "Electronic Data Process-ing Data and Media" at the cost of:

(a) Blank media; and

(b) Labor to copy the electronic data, but only if the electronic data is actually copied.

(17) The value of United States Govern-ment Internal Revenue taxes and custom duties and refundable state and local taxes paid or fully deter-mined on the following property held for sale will not be considered in de-

termining the value of Covered Prop-erty:

(a) Distilled spirits;

(b) Wines;

(c) Rectified products; or

(d) Beer.

(18) Lottery tickets at their initial cost to you except for winning tickets at their redeemed value.

f. Our payment for loss of or damage to personal property of others will only be for the account of the owners of the property. We may adjust losses with the owners of lost or damaged property, if other than you. If we pay the owners, such pay-ments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial in-terest in the Covered Property.

g. We have the right but not the duty to de-fend you against suits arising from claims of owners of property. We will do so at our expense.

h. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss provided you have complied with all of the terms of this policy; and

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

i. At our option, we may make a partial payment toward any claim, subject to the policy provisions and our normal adjust-ment process. To be considered for par-tial claim payment, you must submit a partial sworn proof of loss with supporting documentation. Any applicable policy de-ductibles must be satisfied before any partial payments are made.

5. **Loss Payment – Business Income and Ex-tra Expense**

a. The amount of Business Income loss will be determined based on:

(1) The Net Income of the business be-fore the direct physical loss or dam-age occurred;

(2) The likely Net Income of the business if no physical loss or damage oc-curred, but not including any likely in-crease in Net Income attributable to

Exhibit 1

BUSINESSOWNERS

an increase in the volume of business as a result of favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

(4) Other relevant sources of information, including:

  (a) Your financial records and accounting procedures;

  (b) Bills, invoices and other vouchers; and

  (c) Deeds, liens or contracts.

b. The amount of Extra Expense will be determined based on:

(1) All reasonable and necessary expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

  (a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

  (b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) All reasonable and necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

c. We will reduce the amount of your:

(1) Business Income loss, other than Extra Expense, to the extent you can resume your "operations", in whole or in part, by using damaged or undamaged property (including "stock") at

the described premises or elsewhere; or

(2) Extra Expense loss to the extent you can return "operations" to normal and discontinue such Extra Expense.

d. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

e. We will pay for covered loss or damage within 30 days after we receive your sworn proof of loss provided you have complied with all of the terms of this policy; and

(1) We have reached agreement with you on the amount of loss; or

(2) An appraisal award has been made.

6. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, you may retain the property. But then you must return to us the amount we paid to you for the property. We will pay the recovery expenses and the expenses to repair the recovered property, subject to the applicable Limit of Insurance.

7. **Noncumulative Limit**

No Limit of Insurance cumulates from policy period to policy period.

F. **COMMERCIAL PROPERTY CONDITIONS**

1. **Concealment, Misrepresentation or Fraud**

This Coverage Form is void in any case of fraud by you. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

a. This Coverage Form;

b. The Covered Property;

c. Your interest in the Covered Property; or

d. A claim under this Coverage Form.

2. **Control of Property**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Form at any one or more premises will not affect coverage at any premises where, at the time of loss or damage, the breach of condition does not exist.

Copyright, The Travelers Indemnity Company, 2004

MP T1 02 02 05

Exhibit 1

BUSINESSOWNERS

3. **Insurance Under Two or More Coverages**

If two or more coverages under this Coverage Form apply to the same loss or damage, we will not pay more than the actual amount of the loss or damage.

4. **Legal Action Against Us**

No one may bring a legal action against us under this Coverage Form unless:

  **a.** There has been full compliance with all of the terms of this Coverage Form; and

  **b.** The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

5. **Liberalization**

If we adopt any revision that would broaden the coverage under this Coverage Form without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Form.

6. **No Benefit to Bailee**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

7. **Other Insurance**

  **a.** You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Form. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Form bears to the Limits of Insurance of all insurance covering on the same basis.

  **b.** If there is other insurance covering the same loss or damage, other than that described in Paragraph **a.** above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

8. **Policy Period, Coverage Territory**

Under this Coverage Form:

  **a.** We cover loss or damage you sustain through acts committed or events occurring:

   **(1)** During the policy period shown in the Declarations; and

   **(2)** Within the coverage territory; and

  **b.** The coverage territory is:

   **(1)** The United States of America (including its territories and possessions);

   **(2)** Puerto Rico; and

   **(3)** Canada.

9. **Transfer of Rights of Recovery Against Others to Us.**

If any person or organization to or for whom we make payment under this Coverage Form has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

  **a.** Prior to a loss to your Covered Property or Covered Income; or

  **b.** After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

   **(1)** Someone insured by this insurance;

   **(2)** A business firm:

    **(a)** Owned or controlled by you; or

    **(b)** That owns or controls you; or

   **(3)** Your tenant.

This will not restrict your insurance.

10. **Coinsurance**

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

  **a.** We will not pay the full amount of any loss if the value of Covered Property at the time of loss multiplied by the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

  Instead, we will determine the most we will pay using the following steps:

   **(1)** Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

   **(2)** Divide the Limit of Insurance of the property by the figure determined in step **(1)**;

   **(3)** Multiply the total amount of the covered loss, before the application of

Exhibit 1

BUSINESSOWNERS

any deductible, by the figure deter-
mined in step **(2)**; and

**(4)** Subtract the deductible from the fig-
ure determined in step **(3)**.

We will pay the amount determined in
step **(4)** or the limit of insurance, which-
ever is less.

For the remainder, you will either have to
rely on other insurance or absorb the loss
yourself.

Example No. 1 (Under insurance):

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percent for it is | 90% |
| The Limit of Insurance for it is | $112,500 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

Step (1): $250,000 x 90% = $225,000
(the minimum amount of insurance to
meet your Coinsurance requirements)

Step (2): $112,500/$225,000 = .50

Step (3): $40,000 x .50 = $20,000

Step (4): $20,000 - $250 = $19,750

We will pay no more than $19,750. The
remaining $20,250 is not covered.

*Example No. 2 (Adequate Insurance):*

When:

| | |
|---|---|
| The value of the property is | $250,000 |
| The Coinsurance percentage for it is | 90% |
| The Limit of Insurance for it is | $225,000 |
| The Deductible is | $250 |
| The amount of loss is | $40,000 |

The minimum amount of insurance to
meet your Coinsurance requirement is
$225,000 ($250,000 x 90%).

Therefore, the Limit of Insurance in this
Example is adequate and no penalty ap-
plies. We will pay no more than $39,750
($40,000 amount of loss minus the de-
ductible of $250).

**b.** Coinsurance does not apply to:

**(1)** "Money" and "securities";

**(2)** Additional Coverages;

**(3)** Coverage Extensions; or

**(4)** Loss or damage in any one occur-
rence totaling less than $2,500.

**11. Mortgageholders**

**a.** The term, mortgageholder, includes trus-
tee.

**b.** We will pay for covered loss of or damage
to buildings or structures to each mort-
gageholder shown in the Declarations in
their order of precedence, as interests
may appear.

**c.** The mortgageholder has the right to re-
ceive loss payment even if the mortgage-
holder has started foreclosure or similar
action on the building or structure.

**d.** If we deny your claim because of your
acts or because you have failed to com-
ply with the terms of this Coverage Form,
the mortgageholder will still have the right
to receive loss payment if the mortgage-
holder:

**(1)** Pays any premium due under this
Coverage Form at our request if you
have failed to do so;

**(2)** Submits a signed, sworn proof of loss
within 60 days after receiving notice
from us of your failure to do so; and

**(3)** Has notified us of any change in
ownership or occupancy or substan-
tial change in risk known to the mort-
gageholder.

All of the terms of this Coverage Form will
then apply directly to the mortgageholder.

**e.** If we pay the mortgageholder for any loss
or damage and deny payment to you be-
cause of your acts or because you have
failed to comply with the terms of this
Coverage Form:

**(1)** The mortgageholder's rights under
the mortgage will be transferred to us
to the extent of the amount we pay;
and

**(2)** The mortgageholder's rights to re-
cover the full amount of the mort-
gageholder's claim will not be im-
paired.

At our option, we may pay to the
mortgageholder the whole principal
on the mortgage plus any accrued in-

   Copyright, The Travelers Indemnity Company, 2004   **MP T1 02 02 05**

Exhibit 1

BUSINESSOWNERS

terest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

**f.** If we cancel this policy, we will written notice to the mortgageholder at least:

  **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

  **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

**G. PROPERTY DEFINITIONS**

**1.** **"Banking Premises"** means the interior of that portion of any building which is occupied by a banking institution or similar safe depository.

**2.** **"Breakdown"**

  **a.** Means:

    **(1)** Failure of pressure or vacuum equipment;

    **(2)** Mechanical failure, including rupture or bursting caused by centrifugal force; or

    **(3)** Electrical failure including arcing;

    that causes physical damage to "covered equipment" and necessitates its repair or replacement; and

  **b.** Does not mean:

    **(1)** Malfunction, including but not limited to adjustment, alignment, calibration, cleaning or modification;

    **(2)** Leakage at any valve, fitting, shaft seal, gland packing, joint or connection;

    **(3)** Damage to any vacuum tube, gas tube, or brush;

    **(4)** Damage to any structure or foundation supporting the "covered equipment" or any of its parts;

    **(5)** The functioning of any safety or protective device; or

**(6)** The cracking of any part on any internal combustion gas turbine exposed to the products of combustion.

**3.** **"Communication Supply Services"**

  **a.** Means property supplying communication services, including telephone, radio, microwave or television services, to the described premises, such as:

    **(1)** Communication transmission lines, including fiber optic transmission lines;

    **(2)** Coaxial cables; and

    **(3)** Microwave radio relays, except satellites; and

  **b.** Does not mean overhead transmission lines.

**4.** **"Covered Equipment"**

  **a.** Means the following types of equipment:

    **(1)** Equipment designed and built to operate under internal pressure or vacuum other than weight of contents;

    **(2)** Electrical or mechanical equipment that is used in the generation, transmission or utilization of energy;

    **(3)** Fiber optic cable; and

    **(4)** Hoists and cranes;

  **b.** Does not mean any:

    **(1)** "Electronic Data Processing Equipment";

    **(2)** "Electronic Data Processing Data and Media";

    **(3)** Part of pressure or vacuum equipment that is not under internal pressure of its contents or internal vacuum;

    **(4)** Insulating or refractory material;

    **(5)** Pressure vessels and piping that are buried below ground and require the excavation of materials to inspect, remove, repair or replace;

    **(6)** Structure, foundation, cabinet or compartment supporting or containing the "covered equipment" or part of the "covered equipment" including penstock, draft tube or well casing;

    **(7)** Vehicle, aircraft, self-propelled equipment or floating vessel, including any

Exhibit 1

BUSINESSOWNERS

equipment mounted on or used solely with any vehicle, aircraft, self-propelled equipment or floating vessel;

(8) Elevator or escalator, but not excluding any electrical machine or apparatus mounted on or used with this equipment; or

(9) Equipment or any part of such equipment manufactured by you for sale.

5. **"Diagnostic Equipment"** means any:

a. Equipment; or

b. Apparatus;

used solely for research, diagnostic, medical, surgical, therapeutic, dental or pathological purposes.

6. **"Electronic Data Processing Data and Media"**

a. Means any of the following used in your computer operations:

(1) Data stored as or on, created or used on, or transmitted to or from computer software (including systems and applications) on electronic data processing, recording or storage media such as hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment;

(2) The electronic media on which the data is stored; and

(3) Programming records and instructions used for "Electronic Data Processing Equipment"; and

b. Does not mean "Valuable Papers and Records".

7. **"Electronic Data Processing Equipment"**

a. Means any of the following equipment used in your operations:

(1) Electronic data processing equipment, facsimile machines, word processors, multi-functional telephone equipment and laptop and portable computers; and

(2) Any component parts and peripherals of such equipment, including related surge protection devices; and

b. Does not mean equipment used to operate production type of:

(1) Machinery; or

(2) Equipment.

8. **"Electronic Vandalism"** means any acts by persons, other than "employees", involving any of the following:

a. Willful or malicious destruction of computer programs, content, instructions or other electronic or digital data stored within computer systems; or

b. Unauthorized computer code or programming that:

(1) Deletes, distorts, corrupts or manipulates computer programs, contents, instructions or other electronic or digital data, or otherwise results in damage to computers or computer systems or networks to which is introduced;

(2) Replicates itself, impairing the performance of computers or computer systems or networks; or

(3) Gains remote control access to data and programming within computers or computers systems or networks to which it is introduced, for uses other than those intended for authorized users of the computers or computer systems or networks.

9. **"Employee(s)"**

a. Means:

(1) Any natural person:

(a) While in your service (and for 30 days after termination of service);

(b) Whom you compensate directly by salary, wages or commissions; and

(c) Whom you have the right to direct and control while performing services for you;

(2) Any natural person employed by an employment contractor while that person is subject to your direction and control and performing services for you excluding, however, any such person while having care and custody of property outside the premises; or

Copyright, The Travelers Indemnity Company, 2004    **MP T1 02 02 05**

Exhibit 1

(3) Your directors or trustees while acting as a member of any of your elected or appointed committees to perform on your behalf specific, as distinguished from general, directorial acts; and

b. Does not mean any agent, broker, person leased to you by a labor leasing firm, factor, commission merchant, consignee, independent contractor or representative of the same general character.

10. **"Employee Dishonesty"** means only dishonest acts, committed by an "employee", whether identified or not, acting alone or in collusion with other persons, except you, a partner, a "member", or a "manager" with the manifest intent to:

a. Cause you to sustain loss; and also

b. Obtain financial benefit (other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment) for:

(1) The "employee"; or

(2) Any person or organization intended by the "employee" to receive that benefit.

11. **"Fine Arts"**

a. Means paintings, etchings, pictures, tapestries, art glass windows, valuable rugs, statuary, marbles, bronzes, antique furniture, rare books, antique silver, porcelains, rare glass, bric-a-brac, and similar property with historical value, or artistic merit; and

b. Does not mean any glass that is part of a building or structure.

12. **"Forgery"** means the signing of the name of another person or organization with intent to deceive. "Forgery" does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity for any purpose.

13. **"Interior of any building or structure"** means all portions of the building or structure that are within the exterior facing surface material of the building or structure.

14. **"Maintenance Fees"** means the regular payment made to you by unit-owners and used to service the common property.

15. **"Manager"** means a person serving in a directorial capacity for a limited liability company.

16. **"Member"** means an owner of a limited liability company represented by its membership interest, who also may service as a "manager".

17. **"Money"** means currency and coins in current use, bank notes, travelers checks, register checks and money orders held for sale to the public.

18. **"Operations"** means your business activities occurring at the described premises and the tenantability of the described premises.

19. **"Period of Restoration"**

a. Means the period of time that:

(1) Begins:

(i) For Business Income coverage:

a) With the date of direct physical loss or damage, if the Declarations show Immediately for Period of Restoration – Time Period; or

b) 72 hours after the time of direct physical loss or damage, if the Declarations show 72 hours for Period of Restoration – Time Period; or

(ii) For Extra Expense coverage with the date of direct physical loss or damage;

caused by or resulting from any Covered Cause of Loss at the described premises; and

(2) Ends on the earlier of:

(i) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality; or

(ii) The date when business is resumed at a new permanent location; and

b. Does not mean any increased period required due to the enforcement of any law that:

(1) Regulates the construction, use or repair, or requires the tearing down of any property; or

Exhibit 1

BUSINESSOWNERS

    (2) Requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

The expiration date of this policy will not cut short the "period of restoration".

20. **"Pollutants"** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste, and any unhealthful or hazardous building materials (including but not limited to asbestos and lead products or materials containing lead). Waste includes materials to be recycled, reconditioned or reclaimed.

21. **"Power Generating Equipment"**

  a. Means the following types of equipment or apparatus:

    (1) Pressure;

    (2) Mechanical; or

    (3) Electrical;

    used in or associated with the generation of electric power; and

  b. Does not mean such equipment that is used solely to generate emergency power that is less than or equal to 1000KW.

22. **"Power Supply Services"**

  a. Means the following types of property supplying electricity, steam or gas to the described premises:

    (1) Utility generating plants;

    (2) Switching stations;

    (3) Substations;

    (4) Transformers; and

    (5) Transmission lines; and

  b. Does not mean overhead transmission lines.

23. **"Production Equipment"**

  a. Means any:

    (1) Production machinery; or

    (2) Process machinery;

    that processes, shapes, forms or grinds:

    (1) Raw materials;

    (2) Materials in process; or

    (3) Finished products; and

  b. Includes "covered equipment" that is used solely with or forms an integral part of the:

    (1) Production;

    (2) Process; or

    (3) Apparatus.

24. **"Rental Value"** means Business Income that consists of:

  a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy of the premises described in the Declarations as furnished and equipped by you, including the fair rental value of any portion of the described premises which is occupied by you; and

  b. Continuing normal operating expenses incurred in connection with that premises, including:

    (1) Payroll; and

    (2) The amount of charges which are the legal obligation of the tenant(s) but would otherwise be your obligations.

25. **"Securities"** means all negotiable and non-negotiable instruments or contracts representing either "money" or other property and includes revenue or other stamps in current use, tokens, tickets and credit card slips for sales made by you and held by you for reimbursement from companies issuing credit cards, but does not include "money". Lottery tickets held for sale are not securities.

26. **"Specified Causes of Loss"** means the following:

Fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

  a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

    (1) The cost of filling sinkholes; or

    (2) Sinking or collapse of land into underground man-made cavities.

Copyright, The Travelers Indemnity Company, 2004     **MP T1 02 02 05**

Exhibit 1

**b.** Falling objects does not include loss of or damage to:

    **(1)** Personal Property in the open; or

    **(2)** The "interior of a building or structure", or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

**c.** Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) that is located on the described premises and contains water or steam.

**27. "Stock"** means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

**28. "Suspension"** means:

**a.** The partial or complete cessation of your business activities; or

**b.** That a part or all of the described premises is rendered untenantable.

**29. "Theft"** means any act of stealing.

**30. "Vacant"** means the following:

    **(1)** When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

    **(2)** When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

        **(a)** Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; or

        **(b)** Used by the building owner to conduct customary operations.

**31. "Valuable Papers and Records"**

**a.** Means inscribed, printed or written:

    **(1)** Documents;

    **(2)** Manuscripts; or

    **(3)** Records;

    including abstracts, books, deeds, drawings, films, maps or mortgages; and

**b.** Does not mean "money" or "securities" or "Electronic Data Processing Data and Media".

**32. "Water Supply Services"** means the following types of property supplying water to the described premises:

**a.** Pumping stations; and

**b.** Water mains.

Exhibit 1

**TRAVELERS**

Michael Brown
Technical Specialist

Tennessee Service Center
615-231-3512
866-398-0064 fax

P.O. Box 261640
Tucson, TN 37076

December 4, 2008

Mr. Billy McFadden
McFadden Communications LLC
676 S. Cooper
Memphis, TN 38104

CLAIM NUMBER:          AG755065
POLICYHOLDER          McFadden Communications LLC
DATE OF LOSS          09/12/08 (reported date)
LOCATION OF LOSS      1836 Chelsea, Memphis, TN 38108
Underwriting Company:  The Travelers Indemnity Company of America

Dear Mr. McFadden

We have completed our investigation of your vandalism and theft damage claim and reviewed the records related to your policy. Our investigation reveals that the vandalism and theft damage at 1836 Chelsea, Memphis, TN 38118 described as Location 2 under your policy took place when the building had been "vacant" as defined by the policy, for a period of beyond 60 consecutive days. Based upon this we regret to inform you that coverage does not apply under this policy for the damages to your building. If any further information is discovered that you would like for us to consider, please contact me using the contact information at the top of this page.

The MP T1 01 (02/05) BUSINESSOWNERS PROPERTY COVERAGE SPECIAL FORM on page 4 of 39 states as follows:

5. LIMITATIONS

d. We will not pay for any loss or damage caused by any of the following, even if they are Covered Causes of Loss. If the building where the loss or damage occurs has been "vacant" for more than 60 consecutive days before that loss or damage occurs;

    (1) Vandalism;
    (5) Theft; or
    (6) Attempted theft.



EXHIBIT
**2**

Exhibit 1

Page 2

"Vacant" is defined in the policy (page 59 of 99) as follows:

G. PROPERTY DEFINITIONS:

59. "Vacant means the following:

> (2) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

> (a) Rented to a lessee or sub-lease and used by the lessee or sub-lessee to conduct its customary operations, or
> (b) Used by the building owner to conduct customary operations.

As the building has been "vacant" as defined by the policy in excess of 60 days, there is no coverage for the perils of vandalism or theft.

There may be other reasons your policy does not provide coverage for your claim. Our reference to specific provisions of your policy does not prevent The Travelers Indemnity Company of America from asserting any other terms, conditions, or provisions of your policy, including but not limited to the suit limitation clause. Please note that The Travelers Indemnity Company of America is not waiving any requirements of your contract of insurance and nothing in this letter should be construed as a waiver of any of the conditions or requirements of the insurance policy.

Based on the above, coverage does not apply. If you have any questions, please feel free to give me a call at (901)-373-6133 and I will be happy to help in any way that I can.

Sincerely,

Michael Brown
Travelers Indemnity Company of America


CC:

Kimmons Wilson Insurance Agency


Exhibit 1

**License Agreement**
March 17, 2008

This License Agreement ("Agreement") is entered into as of March 17, 2008 by and between McFadden Communications, LLC a Tennessee Limited Liability Company, ("Owner") and Hi Tech Performance Engine Rebuilders, a Tennessee Sole Proprietorship ("Licensee").

The following definitions shall have the following meaning:

| | |
|---|---|
| **Premises:** | Municipally known as 1836 Chelsea Avenue, Memphis, Tennessee and consisting of two (2) buildings of approximately 35,454 square feet situated on approximately 1.94 acres of land (Premises"). |
| **Purposes:** | Premises used for automobile repair ("Purposes"). |
| **Term:** | Commences March 17, 2008 ("Commencement Date") and continues for thirty (30) days expiring on April 16, 2008 ("Term"). |
| **Term Extension:** | Licensee and Owner acknowledge that Licensee and Owner have entered into a Sales Contract for the purchase and sale of the Premises, attached hereto as Exhibit "A" ("Sales Contract"). Provided Licensee fails to terminate the Sales Contract prior to expiration of the Inspection Period of the Sales Contract and elects to proceed to Closing of the Sales Contract, Owner will agree to extend the term of this Agreement for a period of fifteen (15) days expiring on May 1, 2008 ("Term Extension"). |
| **Licensee Fee:** | Licensee shall be responsible for the payment of all utility costs to Memphis Light Gas and Water. Said utility costs shall include, but not be limited to, all costs for electricity, gas, water, sewage, etc., used by Licensee and/or Owner, at the Premises ("License Fee"). |

In consideration of the mutual covenants and agreements contained herein and payment of the License Fee, Owner grants to Licensee for the Term a license ("License") to enter upon and use the Premises for the Purposes only and for no other purpose whatsoever. While making use of the Premises, Licensee shall, at its sole expense, fully and faithfully comply with any and all applicable laws, rules, regulations and ordinances. During the Term, Licensee shall obtain and keep in full force and effect, at its sole expense, commercial general liability insurance with minimum limits of $300,000 per occurrence and $1,000,000 general aggregate for bodily injury, personal injury, and property damage. Such insurance shall be endorsed to include Owner and its management entities as additional insureds, shall be primary and noncontributory with any Owner insurance. Prior to Licensee's entry and use of the Premises for the Purposes, Licensee shall deliver to Owner a certificate in form and substance satisfactory to Owner or other evidence satisfactory to Owner evidencing the existence of the insurance required by Owner.

Licensee accepts the Premises in its **"As Is"** condition. Licensee further agrees to surrender the Premises to Owner in the condition in which it was delivered, damage covered by insurance excepted to the extent proceeds of such insurance are actually received by Owner. Licensee shall, at its sole cost and expense, maintain and repair the Premises, and all systems serving the Premises during the Term, and Term Extension, if any. Licensee will permit unrestricted access to the Premises at all times without notice to Owner and any representatives or invitees of Owner.

The License is revocable immediately and without any notice upon breach of any of the terms of this Agreement ("Revocation") or, if no breach has occurred, immediately upon the expiration of the Term, and Term Extension, if any, included herein ("Termination"). Notice of Revocation or Termination shall be in writing. Notice shall be effective when personally delivered, or 48 hours after deposit in the mail if mailed. If mailed, the notice shall be sent first-class mail, postage prepaid, addressed to the party at the address set forth below the signature line for that party. The License shall terminate upon its Revocation or Termination as the case may be. Notwithstanding the Revocation or Termination of the License, Licensee shall continue to remain liable for any obligations imposed on Licensee by this Agreement and for the breach by Licensee or its agents, contractors, employees, licensees or invitees of any term or provision of this Agreement.

**EXHIBIT 3**

Exhibit 1

Licensee shall defend, with counsel reasonably satisfactory to Owner, and shall indemnify and hold harmless Owner and Owner's officers, directors, shareholders, agents, members, managers, employees, partners, successors, and assigns (for purposes of this paragraph, Owner and Owner's officers, directors, shareholders, agents, members, managers, employees, partners, successors, and assigns are collectively referred to as "Owner") from and against any damages, losses, claims, liens, expenses, liabilities, injuries, and other expenses of any nature whatsoever, including reasonable attorney's fees and cost, relating to or arising from Licensee's use or maintenance of the Premises, or from any activity work or thing done, permitted or suffered by Licensee in or about the Premises, or arising or resulting from any breach or default by Licensee of its obligations under this Agreement. Licensee, as a material part of the consideration given to Owner, assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever, other than as a result of Owner's gross negligence or willful misconduct, and Licensee waives all claims in respect thereof against Owner and releases Owner of all such claims. The covenants contained in this paragraph shall survive the expiration or earlier termination of this Agreement.

The rights granted herein to Licensee are personal to Licensee and shall not be assigned or transferred by Licensee.

This Agreement supersedes any other previous or contemporaneous agreement or understanding between the parties with respect to the subject matter herein and contains the entire understanding between the parties with respect to the subject matters herein. In the event that Owner transfers the real property of which the Premises are a part or any interest therein including the Premises, or is otherwise divested thereof, then the rights of Owner under this Agreement shall pass to Owner's successor. If any party institutes an action or proceeding to enforce this Agreement as against any other party thereto, the losing party shall pay to the prevailing party the attorney's fees and cost incurred by the prevailing party in such action or proceeding. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto. Should any action or other proceeding or arbitration arise regarding the enforcement or interpretation of this Agreement, it shall take place in the County of Shelby subject to the laws of the State of Tennessee.

OWNER:                                          LICENSEE:

McFadden Communications, LLC                    Hi Tech Performance Engine Rebuilders
a Tennessee limited liability company           a Tennessee sole proprietorship

By: _____                       By: _____

Name: J. Stillman McFadden                      Name: Marcus Smith

Its:  Chief Manager                                   Its:  Owner

Address: 670 S. Cooper St.                       Address: 854 N. Ericson Rd.
         Memphis, TN 38104                                Cordova, TN 38018

Exhibit 1

# SALES CONTRACT

(Total number of executed copies made __5__ )                    Memphis, TN                    February 18, 2008

RECEIVED OF Marcus Smith the sum of Three Thousand and No/100 Dollars ($3,000.00) as earnest money and in part payment for the purchase of the following described real estate, situated in the City of Memphis, County of Shelby, and State of Tennessee, to-wit:

> Two industrial buildings of approximately 35,454 square feet, situated on approximately 1.94 acres of land, located at the NW corner of Chelsea Avenue and McLean Boulevard, Memphis, Tennessee, being identified by the Shelby County Assessor's office as Parcel No. 041001 00195C and being all the property owned at this location by Seller, inclusive of the afterburner (hereinafter the "Property").

The Seller covenants and agrees to sell and convey said real estate, with all improvements thereon, or cause the same to be conveyed, by good and sufficient warranty deed, unto the Purchaser, or unto such person or persons as the Purchaser may designate (the undersigned Purchaser, however, shall not be released from any of the Purchaser's agreements and undertakings as set forth herein, unless otherwise stated); and the Purchaser covenants and agrees to purchase and accept the same, at and for the total price of Two Hundred Five Thousand and No/100 Dollars ($205,000.00), upon terms as follows:

All cash at Closing, of which the earnest money is a part.

This Offer to Purchase is expressly contingent for a period of up to fifty-five (55) days from Date of Acceptance for Purchaser's inspections and satisfaction with the Property (hereinafter the "Inspection Period"). Purchaser may terminate this Contract on or before the fifty-fifth (55th) day after Date of Acceptance, for any reason whatsoever in Purchaser's sole discretion, by providing written notice thereof to Seller, in which event the earnest money shall be returned to Purchaser and there shall be no further obligation of either party to the other. If notice is not provided as stated above, then Purchaser and Seller shall proceed to Closing, which shall occur within fifteen (15) days of the expiration of the Inspection Period (hereinafter the "Closing").

The earnest money shall be deposited in the regular earnest money account at Colliers Wilkinson Snowden.

Purchaser and Seller understand and agree that Henry Stratton and Colliers Wilkinson Snowden are acting as agents of the Seller.

Title to be conveyed subject to all restrictions, easements and covenants of record, and subject to zoning ordinances or laws of any governmental authority.



Exhibit 1

evidence of an election to declare this contract canceled, as Seller shall have the right to retain his portion of this earnest money to be credited against damages actually sustained.

The Seller agrees to pay Colliers Wilkinson Snowden a commission of six percent (6%) of the sales price. Unless otherwise specified herein, such commission is to be paid in cash out of the net proceeds of the sale at time of closing this transaction.

Seller is to pay for preparation of deed, recording of purchase money trust deed, if any, continuation of written evidence of title, state tax and clerk's fee on trust deed, and notary fee on deed. Purchaser is to pay for preparation of note, or notes, and trust deed, notary fee on trust deed, recording of Warranty Deed, state tax on Warranty Deed, and expense of title insurance, except as hereinbefore provided. Seller and Purchaser are to share equally in paying closing fees in connection with this transaction. If Purchaser obtains a loan on this property, he is to pay all expenses incident thereto.

Should there be any tax, insurance, or other accrual items on deposit with the holder of any debt secured by said premises and assumed by Purchaser, the Purchaser shall at the time of closing reimburse the Seller therefor.

Seller warrants and represents to Purchaser that as of the Effective Date of this Agreement and as of the Closing hereof, as follows:

(a)       There is no pending or, to the knowledge of Seller, threatened condemnation or similar proceeding or special assessment affecting the Property, or any part thereof, nor to the knowledge of Seller, is any such proceeding or assessment contemplated by any Governmental Authority. As used herein, the term "Governmental Authority" shall mean the United States, the State of Tennessee, the City of Memphis, any applicable county or district, and any agency, department, commission, board, bureau or instrumentality of any of them.

(b)       No assessments for public improvements or otherwise have been made against the Property which remain unpaid by Seller including, without limitation, those for construction of sanitary or storm sewer, water, gas and electric lines and mains, streets, roads, sidewalks and curbs; and to the best of Seller's knowledge, none have been proposed.

The aforesaid representations and warranties of Seller shall survive the Closing of this Agreement.

This instrument when signed only by the prospective Purchaser shall constitute an offer, which shall not be withdrawable in less than 72 hours from the date hereof.

Notices hereunder shall be given, in writing, by Certified Mail, Return Receipt Requested, Federal Express, Registered Mail, or other similar mailing requiring the execution of a signed receipt by the recipient. Notices shall be deemed given and delivered when a receipt therefore is executed by the party receiving notice. If the party to _____ addressed refuses to accept delivery or execute a receipt therefore, notice shall be deemed given

Exhibit 1

Witness the signatures of all parties the day and year above written.

Subject to clearance of any check given, the undersigned Agent acknowledges receipt of the above mentioned earnest money and holds same in trust subject to the terms of this contract.

Purchaser(s): _____

By: _____
    Marcus Smith

Colliers Wilkinson Snowden

By: _____

Seller: McFadden Communications LLC

By: _____
    J. Stillman McFadden

Purchaser and Seller agree that the Date of Acceptance is February 21st, 2008, as evidenced by their initials hereto.
Purchaser _____   Seller _____

Exhibit 1

# Memphis Police Department

Incident Report #0807013499ME

| Location of Occurrence | Apt. Complex/Business | | City/State | | District |
|---|---|---|---|---|---|
| 1836 Chelsea | Hi Tech Performance Engine Re | | Memphis, TN  38108 | | 127 |

| Reporting Officer | Emp # | Car # | Partner | Emp # |
|---|---|---|---|---|
| M. A. Scarborough | 10464 | 157A | B. Jayroe | 11212 |

Offense(s) (1-10 listed by description)

| Offense 1: | Burglary/Business | | 220 | | Completed |
|---|---|---|---|---|---|

| Date/Time Reported/Arrived | Date/Time Occurred Between | |
|---|---|---|
| 7/23/2008 3:48:00 AM | 7/22/2008 3:00:00 PM | 7/23/2008 2:54:00 AM |

## COMPLAINANT

Name   Smith, Marcus C

| Address | City | State | ZIP + 4 | Home Phone | Work Phone |
|---|---|---|---|---|---|
| 1836 Chelsea | Memphis | TN | 38108 | 901-552-4361 | 901-552-4361 |

| Driver's License | State | Social Security # | DOB | Age | Race | Sex |
|---|---|---|---|---|---|---|
| 097196851 | TN | ▬▬▬▬▬ | 7/24/1982 | 25 | BLACK | MALE |



EXHIBIT
4

Exhibit 1

Incident Report #0807013499ME

# Memphis Police Department

## VICTIM #  1
(Related Offense(s)):   220

Name   Hi Tech Performance Engine Rebuilde

| Address | | City | State | ZIP + 4 | Home Phone | Work Phone |
|---|---|---|---|---|---|---|
| 1836 Chelsea | | Memphis | TN | 38108 | 901-552-4361 | |

| Driver's License | State | Social Security #DOB | Age | Race | | Sex |
|---|---|---|---|---|---|---|
| | TN | | | UNKNOWN | | UNKNOWN |

| Ethnicity | Height | Weight | Eye Color | | Hair Color | Marital Status |
|---|---|---|---|---|---|---|

| Clothing | Gang Name or Affiliation | Residency |
|---|---|---|

| Language | Employer | Work Address | Occupation | Cell Phone |
|---|---|---|---|---|

Domestic Violence?  NO                                                           Pager

Emergency Contact for Victim            ~~~~~~~~            Phone

Victim Injuries

How Assaulted

Medical Treatment

Prior Conflicts With Suspect

Negligent Manslaughter /Homicide Aggravated Assault Circumstance

## County Colleges:
Is Victim a College Student in This County?NO
    Victim Involved Was:
        College Code:

Victim Arrested: NO

Victim Relationship to Suspect
    Offender 1:                                         Offender 6:
    Offender 2:                                         Offender 7:
    Offender 3:                                         Offender 8:
    Offender 4:                                         Offender 9:
    Offender 5:                                         Offender 10:

## LEOKA INFORMATION
Law Enforcement Activity                     Law Enforcement Assignment

Assault/Killing Type                              Weapon Used

2

Exhibit 1

Incident Report #0807013499ME

# Memphis Police Department

## Child Witnesses - Domestic Violence Only

| Name | Age | Sex |
|------|-----|-----|
|      |     |     |

## SUSPECT # 1

**Name**  Brown, Charles D

| Address | City | State | ZIP + 4 | Home Phone | Work Phone |
|---------|------|-------|---------|------------|------------|
| 1979 Alcy Rd | Memphis | TN | 38114 | Unknown | |

| Driver's License | State | Social Security # | DOB | Age / Age Range | Sex |
|------------------|-------|-------------------|-----|-----------------|-----|
| 054547048 | TN | | 6/8/1960 | 48 | MALE |

| Race | Height | Ethnicity | Weight | Eye Color | Hair Color | Marital Status |
|------|--------|-----------|--------|-----------|------------|----------------|
| BLACK | 507 | NON-HISPANIC | 169 | | | Single |

**Clothing**
Black hat; black t-shirt; dark blue jeans; white tennis shoes

**Gang Name or Affiliation**

**Residency**

| Language | Employer | Work Address | Cell Phone | Pager |
|----------|----------|--------------|------------|-------|
| English | | | | |

**Occupation**
Disabled

## Scars, Marks, and Tattoos:
**Primary Features:**

| Glasses | Complexion | Teeth | Beard/FacialHair | BUI | Hair Length | Hair Syle |
|---------|------------|-------|------------------|-----|-------------|-----------|
| Glasses | Dark | None | Mustache | Heavy | | Afro/Natural |

| Speech | Voice | General Appearance | Demeanor |
|--------|-------|--------------------|----------|
| Talkative | MEDIUM | DIRTY | Calm |

Arrested:YES 03

3

Exhibit 1

Incident Report #0807013499ME

# Memphis Police Department

## SUSPECT # 2

**Name**   Shaw, Willie

| Address | | City | State | ZIP + 4 | Home Phone | Work Phone |
|---|---|---|---|---|---|---|
| 911 Second | | Memphis | TN | | 901-526-2076 | |

| Driver's License | State | Social Security # | | DOB | Age / Age Range | Sex |
|---|---|---|---|---|---|---|
| 080564112 | TN | | | 5/5/1970 | 38 | MALE |

| Race | Height | | Ethnicity | Weight | Eye Color | Hair Color | Marital Status |
|---|---|---|---|---|---|---|---|
| BLACK | 506 | | NON-HISPANIC | 145 | | | Married |

**Clothing**
Black t-shirt; dark blue pants; black shoes        **Gang Name or Affiliation**        **Residency**

| Language | Employer | Work Address | Cell Phone | Pager |
|---|---|---|---|---|
| English | FedEx | | | |

**Occupation**
Loader

**Scars, Marks, and Tattoos:**
**Primary Features:**

| Glasses | Complexion | Teeth | Beard/FacialHair | BUI | Hair Length | Hair Syle |
|---|---|---|---|---|---|---|
| | Dark | | Unshaven | Thin | | Bald/Balding |

| Speech | Voice | General Appearance | | Demeanor |
|---|---|---|---|---|
| Talkative | RASPY | DIRTY | | Angry |

Arrested:YES 03

## SUSPECT ACTIONS

**Total # Suspects:**   Male/Black Suspects: 2.

**All Crimes:**
SUSPECT(S) KNOWN.  TOOK OTHER.

**Crimes Against Persons:**

**Crimes Against Property:**
VANDALIZED.

4

Exhibit 1

Incident Report #0807013499ME          **Memphis Police Department**

## OFFENSE INFORMATION - OFFENSE # 1

**Criminal Activity**

| | | | |
|---|---|---|---|
| **Location** | **Units Entered** | **Home Invasion** | **Method of Entry** |
| SPECIALTY STORE | | | FORCIBLE |

**Hate Crime/Incident Bias**
NONE

**Gang Activity   Gang 1 Type/Name**                          **Gang 2 Type/Name**
NO GANGS     :                                                :

**Weapon/Force Involved**

**Offender Suspected of Using**

**Point of Entry**
1) Vent.

**Point of Exit**                    **Tools Used**              **How Used**
1) Rear Door.                        1) Physical. 2) Pliers.

## OFFENSE LOCATION INFORMATION

| **Crime Scene** | **Type of Business** | **Place/Target of Offenses** |
|---|---|---|
| CSC | BSY | MOE |
| **How Entered** | | |
| HWE | | |
| **How Call Received** | **Security Used** | |
| HCR | SCU | |
| **Weather** | **Lighting** | |
| WTH | LLV | |

5

Exhibit 1

Incident Report #0807013499ME      **Memphis Police Department**

## PROPERTY # 1

Related Offense:220

| Reportable Property | Worthless Document | Weapon | IBR Property Code |
|---|---|---|---|
| YES | NO | NO | 38 - VEHICLE PARTS/ACCESSORIES |

**Item/Weapon Type**
Engine

| Item Brand | Model | Serial | OAN |
|---|---|---|---|
| Various | | | |

**Characteristics/Description**
Various engines, carbs, intakes, altenators

| Insurance Company | Insurance Phone | Color | Quantity | Unit of Measure | Total Value |
|---|---|---|---|---|---|
| | | Black | 30 | | 15000 |

| Finish | Caliber | Gauge | Length | Automatic | Other |
|---|---|---|---|---|---|

| Instrument Number | Instrument Date | Card Company | Account Name |
|---|---|---|---|

| Bank Name | Account Number | Payable To | ID Used | $ Amount on Document |
|---|---|---|---|---|

| Recovery Location | | Property Location |
|---|---|---|

| Owner Name | SSN | Owner Is |
|---|---|---|
| Smith,  Marcus  C | 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 | |

| Owner Is Other | Tag/Property Receipt Number | Type Property Loss (UCR) | Agency Status |
|---|---|---|---|
| YES | | STOLEN | |

6

Exhibit 1

Incident Report #0807013499ME                **Memphis Police Department**

# VEHICLE # 1

| License # | State | Expires | VIN |
|---|---|---|---|
| 406SVM | TN | 7/1/2009 | 1G6KD52B4RU237334 |

| Vehicle Type | | Year | Make | | Model |
|---|---|---|---|---|---|
| Passenger | | 1994 | Cadillac | | Deville |

| Color | | Doors | Value | Value of Recovered Parts |
|---|---|---|---|---|
| Purple | | 4 | 7000 | |

| Owner Is | Other Owner | Name |
|---|---|---|
| Suspect# 1 | NO | |

**Additional Description**

**Insurance Company:**                                        **Insurance Phone:**

## Recovery Information

| Arrest Yes/No | How Many Arrested | Recovery Location | District | Recovery Time |
|---|---|---|---|---|

| Owner Notified By | Date/Time Notified | Method Notified | Released To |
|---|---|---|---|

| Date/Time Released | Released By | Recovered Stripped/Damaged Information |
|---|---|---|

| Type Property Loss (UCR) | NONE | Agency Status |
|---|---|---|

# DRUGS

| Drug Type | | Quantity | Measure |
|---|---|---|---|

| Number of Plants | Number of Plots | | Latitude | Longitude |
|---|---|---|---|---|
| | | DRM | | |

**Drug Paraphernalia Description**

| Property Tag/Receipt No. | Color | Property Status |
|---|---|---|

# NARRATIVE # 1

On 07/23/08 at 03:48 hours, officer(s) M. A. Scarborough (10464) and B. Jayroe (11212) responded to a Burglary/Business at 1836 Chelsea and the Reporting Officer advised That on 07.23.08 at 0254 hrs A/O'S observed the headlights of a light brown 1994 Cadillac baring TN tag #406SVM pulling out of the woods behind the business at 1836 Chelsea. As the veh.

7

Exhibit 1

Incident Report #0807013499ME         **Memphis Police Department**

pulled out onto Mclean the vehicle stopped as the officer pulled up to him. Sus: Brown, Charles got out of the drivers seat and walked up to the A/O's car. A/O observed Sus: Brown, Charles to have grease smudges on his hands and his clothing were soaking wet. A/O conducted a QW and DLC on Sta. B where it was revealed that his D/L was revoked on 06.22.01 for DUI. Sus: Brown, Charles was placed under arrest for driving on a revoked D/L. An inventory incidental to arrest was conducted and several engine blocks, manifolds and various other engine parts were found in the trunk. Also found in the trunk was 20 copper pipes approximately three feet in length, large rubber gloves and a small sledge hammer. A/O observed various engine parts in two large tote bins in the rear seat. The passenger, Sus: Shaw, Willie was sitting in the front passenger seat and was detained. During pat down A/O could feel a metalic object in his left front pocket. Sus: Shaw, Willie stated that it was his wrist watch (Relic). A/O's followed the trail that the car was sitting at and it led to a large hole in the chain link fence. Several engine parts were lying on the ground. A/O's observed a large vent duct removed from the building where access could be gained to the building. The door beside the vent was unlocked and had greasy prints on it. Lt. Gentry, IBM #2953, car #106 made the scene and advised. Compl: Smith, Marcus made the scene and advised that the property in Sus: Brown, Charles's car was his. Compl: Smith, Marcus further advised that the Relic watch and sledge hammer was his also. Crime Scene Officer D. Beckham, IBM #0251, Car #2331 processed the scene and took photos. The copper tubing found in the trunk was cut from the NW corner of the building which is owned by James Mcfagdon (Toof Printing Co. on S. Cooper St.) Both suspects were transported to 201 Poplar.

8

Exhibit 1

FARRIS BOBANGO BRANAN PLC

ATTORNEYS AT LAW

One Commerce Square, Suite 2000 / Memphis, TN 38103 / 901-259-7100 / Fax 901-259-7150

December 8, 2008

The Travelers Indemnity Company of America
c/o Mike Brown
6840 LaGrange Grove Lane
Cordova, Tennessee 38018

      Re:    McFadden Communications, LLC
            Policy No. 3085L148
            Claim No. A6Z5065
            Property: 1836 Chelsea, Memphis, Tennessee
            Date(s) of Loss: September, 2008

Dear Mr. Brown:

      Our firm represents McFadden Communications LLC ("McFadden") with regard to the above theft losses. I am sure you are familiar with this claim, so I will not restate all details.

      Travelers acknowledged receipt of the claim in writing on September 30, 2008. Two weeks later, on October 15, 2008, Stillman McFadden met with Chris Morrill, Travelers' investigator, and provided the following: (1) recorded interview; (2) sales contract and license agreement to Marcus Smith d/b/a Hi Tech Performance Engine Rebuilders; (3) certificate of insurance obtained by Marcus Smith; (4) relevant Memphis, Light, Gas & Water invoices; and, (5) estimate from Butterbean Electric totaling $600,000. Four or five weeks ago, Travelers' electrician inspected the property to prepare an estimate. While ample time has been afforded for Travelers' to complete its investigation, it is our understanding the investigation is still underway and your electrician is not yet 50% complete with his quote. If anything further is needed from McFadden that has not already been provided, please advise immediately. If further entry to the building is needed, it can be arranged on short notice.

      As you are aware, McFadden received an offer to sell the property, and desires to move forward with the sale. McFadden is also aware that your company is pushing his agent to remove the property from its policy despite no resolution of the claim. Time is of the essence. Since Travelers has had ample time to investigate this claim, it will not be prejudiced by the sale, nor will a sale of the property impair this claim. The prospective purchaser is aware of this claim and will reasonably cooperate with Travelers as may be needed in the near future, including allowing entry to the building. If Travelers has any objection to the impending sale of the



EXHIBIT
5

Exhibit 1

## FARRIS BOBANGO BRANAN, PLC

Mark Brown
December 8, 2008
Page 2

property, please notify me within 48 hours. Otherwise, McFadden assumes that Travelers has no objection and agrees that the sale of the property will not affect this claim. Should Travelers' opinion differ from the aforementioned statement, notice of such position should be sent to my attention immediately. The closing of the sale is expected to occur within a week.

For the time being, McFadden is willing to resolve this claim for the value of the stolen materials. However, if the current proposed sale of the property does not occur, because of the delay in resolving this claim, then McFadden reserves its right to insist that the stolen materials be replaced by Travelers. As you might be aware, the difference between the value and replacement cost, because of labor alone, is likely to approach two hundred thousand dollars. The value of the property and its use was much greater prior to the claim and will be again once the repairs are made.

This letter shall serve as formal notice of demand for payment pursuant to T.C.A. § 56-7-105. This claim needs to be resolved. In the event this claim is not resolved within 60 days as contemplated by law, McFadden will consider all legal options available to it including, but not limited to, filing suit for bad-faith failure to pay and violations of Tennessee's Unfair Claim Settlement Practices Act, T.C.A. § 56-8-104. We hope this will not be necessary.

We look forward to hearing from you to conclude this matter. McFadden remains ready, willing, and able to fully cooperate with Travelers and negotiate a fair and reasonable settlement of it claim.

Sincerely,

Garrett M. Estep/mp

Garrett M. Estep

GME/mbp
cc:   Stillman McFadden
      Eddie Floyd
G:\DATA\GME\McFadden\Travelers\MB081208 ltr.doc

Exhibit 1

# FARRIS BOBANGO BRANAN PLC

### ATTORNEYS AT LAW

One Commerce Square, Suite 2000 / Memphis, TN 38103 / 901-259-7100 / Fax 901-259-7150

December 29, 2008

The Travelers Indemnity Company of America
c/o Mike Brown
P.O. Box 681746
Franklin, Tennessee 37068

      Re:    Insured: McFadden Communications, LLC
              Policy No. 3085L148
              Claim No. A6Z5065
              Property: 1836 Chelsea, Memphis, Tennessee
              Date(s) of Loss: September 12, 2008

Dear Mr. Brown:

      On behalf of our client, McFadden Communications, LLC ("McFadden"), our firm is continuing to search for additional evidence to document occupancy at its 1836 Chelsea property by Marcus Smith d/b/a Hi Tech Engine Rebuilders. The purpose of this search is to refute your company's recent denial of McFadden's claim and to avoid litigation. As stated in your letter dated December 4, 2008, that denial was based on your opinion that the building was unoccupied for over 60 days prior to the claim occurring. We have additional evidence of occupancy of the property during that 60 day time period.

      At about 4 AM on July 23, 2008, Officers M.A. Scarborough and B. Jayroe of the Memphis Police Department arrested two men for burglarizing the business of Marcus Smith d/b/a Hi Tech Performance Engine Rebuilders. That business occupied 1836 Chelsea. Engine parts and a Relic watch were among the items stolen. Marcus Smith made the scene, identified the stolen property as his, and complained to the police. A copy of the resulting incident report is enclosed.

      A copy of the license agreement and sales contract between Marcus Smith and McFadden has already been provided to Traveler's, along with other supporting documents. We are continuing our efforts to locate Marcus Smith and other evidence demonstrating that the property was not "vacant" as Traveler's contends in its December 4, 2008 denial letter. Stillman McFadden, President of McFadden, Ronnie Kiihnl, Vice-President of McFadden, Bubba Ross, Plant Maintenance Manager of McFadden, and Henry Stratton, agent for Colliers Wilkinson and Snowden are all prepared to testify that the property was not vacant for 60 days or more prior to



EXHIBIT
**6**

Exhibit 1

## FARRIS BOBANGO BRANAN, PLC

Mike Brown
December 29, 2008
Page 2

the September thefts.  Marcus Smith did not vacate the property until August, 2008.  The fact that a theft of property occurred at 1836 Chelsea and that the tenant, Marcus Smith, filed the enclosed police report is conclusive evidence that the property was, in fact, occupied at that time.

If Traveler's intends to assert any basis for the denial of McFadden's theft claim, other than that the property was allegedly vacant for 60 days or more beforehand, please notify me immediately.  Absent such timely notice from Traveler's, McFadden assumes that Traveler's has completed its investigation and has no other basis on which to deny the claim.

McFadden remains ready, willing, and able to fully cooperate with Travelers and negotiate a fair and reasonable settlement of it claim.  Traveler's is urged to reconsider its denial in light of this new information discovered by McFadden in the course of its own ongoing investigation.  This claim needs to be resolved with 60 days of December 8, 2008, as set forth in our previous letter; otherwise, McFadden reserves its right to pursue all remedies available at law.

Sincerely,

Garrett M. Estep

GME/mbp
Enclosure
cc:    Andre Crowder
       Jack C. Risley
       Stillman McFadden
       Eddie Floyd
G:\DATA\GME\McFadden\Travelers\MB081229.ltr.doc

Exhibit 1



DEPA
NASHVILLE, TENNESSEE 37243

7008 1830 0000 6982 9520

CERTIFIED MAIL

FIRST CLASS

UNITED STATES POSTAGE
PITNEY BOWES
02 1A
0004615966      $ 07.60⁰
MAY 07 2009
MAILED FROM ZIP CODE 37243

7008 1830 0000 6982 9520          5/6/09
TRAVELERS INDEMNITY CO OF AMERICA
2908 POSTON AVENUE, % C S C
NASHVILLE, TN  37203

Exhibit 1